# MINNICK *v.* MISSISSIPPI

No. 89–6332.   Argued October 3, 1990—Decided December 3, 1990

KENNEDY, J., delivered the opinion of the Court, in which WHITE, MAR-SHALL, BLACKMUN, STEVENS, and O'CONNOR, JJ., joined. SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C. J., joined, *post*, p. 156. SOUTER, J., took no part in the consideration or decision of the case.

*Floyd Abrams* argued the cause for petitioner. With him on the briefs were *Anthony Paduano* and *Clive A. Stafford Smith.*

*Marvin L. White, Jr.,* Assistant Attorney General of Mississippi, argued the cause for respondent. With him on the brief was *Mike Moore,* Attorney General.*

JUSTICE KENNEDY delivered the opinion of the Court.

To protect the privilege against self-incrimination guaranteed by the Fifth Amendment, we have held that the police must terminate interrogation of an accused in custody if the accused requests the assistance of counsel. *Miranda* v. *Arizona,* 384 U. S. 436, 474 (1966). We reinforced the protections of *Miranda* in *Edwards* v. *Arizona,* 451 U. S. 477, 484–485 (1981), which held that once the accused requests counsel, officials may not reinitiate questioning "until counsel has been made available" to him. The issue in the case before us is whether *Edwards'* protection ceases once the suspect has consulted with an attorney.

---

*David W. DeBruin* and *Donald B. Verrilli, Jr.,* filed a brief for the Mississippi State Bar as *amicus curiae* urging reversal.

*Solicitor General Starr, Assistant Attorney General Dennis, Deputy Solicitor General Bryson,* and *Nina Goodman* filed a brief for the United States as *amicus curiae* urging affirmance.

Petitioner Robert Minnick and fellow prisoner James Dyess escaped from a county jail in Mississippi and, a day later, broke into a mobile home in search of weapons. In the course of the burglary they were interrupted by the arrival of the trailer's owner, Ellis Thomas, accompanied by Lamar Lafferty and Lafferty's infant son. Dyess and Minnick used the stolen weapons to kill Thomas and the senior Lafferty. Minnick's story is that Dyess murdered one victim and forced Minnick to shoot the other. Before the escapees could get away, two young women arrived at the mobile home. They were held at gunpoint, then bound hand and foot. Dyess and Minnick fled in Thomas' truck, abandoning the vehicle in New Orleans. The fugitives continued to Mexico, where they fought, and Minnick then proceeded alone to California. Minnick was arrested in Lemon Grove, California, on a Mississippi warrant, some four months after the murders.

The confession at issue here resulted from the last interrogation of Minnick while he was held in the San Diego jail, but we first recount the events which preceded it. Minnick was arrested on Friday, August 22, 1986. Petitioner testified that he was mistreated by local police during and after the arrest. The day following the arrest, Saturday, two Federal Bureau of Investigation (FBI) agents came to the jail to interview him. Petitioner testified that he refused to go to the interview, but was told he would "have to go down or else." App. 45. The FBI report indicates that the agents read petitioner his *Miranda* warnings, and that he acknowledged he understood his rights. He refused to sign a rights waiver form, however, and said he would not answer "very many" questions. Minnick told the agents about the jailbreak and the flight, and described how Dyess threatened and beat him. Early in the interview, he sobbed "[i]t was my life or theirs," but otherwise he hesitated to tell what happened at the trailer. The agents reminded him he did not have to answer questions without a lawyer present. According to the report, "Minnick stated 'Come back Monday when I have a law-

yer,' and stated that he would make a more complete statement then with his lawyer present." App. 16. The FBI interview ended.

After the FBI interview, an appointed attorney met with petitioner. Petitioner spoke with the lawyer on two or three occasions, though it is not clear from the record whether all of these conferences were in person.

On Monday, August 25, Deputy Sheriff J. C. Denham of Clarke County, Mississippi, came to the San Diego jail to question Minnick. Minnick testified that his jailers again told him he would "have to talk" to Denham and that he "could not refuse." *Id.*, at 45. Denham advised petitioner of his rights, and petitioner again declined to sign a rights waiver form. Petitioner told Denham about the escape and then proceeded to describe the events at the mobile home. According to petitioner, Dyess jumped out of the mobile home and shot the first of the two victims, once in the back with a shotgun and once in the head with a pistol. Dyess then handed the pistol to petitioner and ordered him to shoot the other victim, holding the shotgun on petitioner until he did so. Petitioner also said that when the two girls arrived, he talked Dyess out of raping or otherwise hurting them.

Minnick was tried for murder in Mississippi. He moved to suppress all statements given to the FBI or other police officers, including Denham. The trial court denied the motion with respect to petitioner's statements to Denham, but suppressed his other statements. Petitioner was convicted on two counts of capital murder and sentenced to death.

On appeal, petitioner argued that the confession to Denham was taken in violation of his rights to counsel under the Fifth and Sixth Amendments. The Mississippi Supreme Court rejected the claims. With respect to the Fifth Amendment aspect of the case, the court found "the *Edwards* bright-line rule as to initiation" inapplicable. 551 So. 2d 77, 83 (1988). Relying on language in *Edwards* indicating that the bar on interrogating the accused after a request for coun-

sel applies "'until counsel has been made available to him,'" *ibid.*, quoting *Edwards* v. *Arizona, supra,* at 484–485, the court concluded that "[s]ince counsel was made available to Minnick, his Fifth Amendment right to counsel was satisfied." 551 So. 2d, at 83. The court also rejected the Sixth Amendment claim, finding that petitioner waived his Sixth Amendment right to counsel when he spoke with Denham. *Id.*, at 83–85. We granted certiorari, 495 U. S. 903 (1990), and, without reaching any Sixth Amendment implications in the case, we decide that the Fifth Amendment protection of *Edwards* is not terminated or suspended by consultation with counsel.

In *Miranda* v. *Arizona, supra,* at 474, we indicated that once an individual in custody invokes his right to counsel, interrogation "must cease until an attorney is present"; at that point, "the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning." *Edwards* gave force to these admonitions, finding it "inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." 451 U. S., at 485. We held that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Id.*, at 484. Further, an accused who requests an attorney, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.*, at 484–485.

*Edwards* is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan* v. *Harvey,* 494 U. S. 344, 350 (1990).

See also *Smith* v. *Illinois*, 469 U. S. 91, 98 (1984). The rule ensures that any statement made in subsequent interrogation is not the result of coercive pressures. *Edwards* conserves judicial resources which would otherwise be expended in making difficult determinations of voluntariness, and implements the protections of *Miranda* in practical and straightforward terms.

The merit of the *Edwards* decision lies in the clarity of its command and the certainty of its application. We have confirmed that the *Edwards* rule provides " 'clear and unequivocal' guidelines to the law enforcement profession." *Arizona* v. *Roberson*, 486 U. S. 675, 682 (1988). Cf. *Moran* v. *Burbine*, 475 U. S. 412, 425–426 (1986). Even before *Edwards*, we noted that *Miranda*'s "relatively rigid requirement that interrogation must cease upon the accused's request for an attorney . . . has the virtue of informing police and prosecutors with specificity as to what they may do in conducting custodial interrogation, and of informing courts under what circumstances statements obtained during such interrogation are not admissible. This gain in specificity, which benefits the accused and the State alike, has been thought to outweigh the burdens that the decision in *Miranda* imposes on law enforcement agencies and the courts by requiring the suppression of trustworthy and highly probative evidence even though the confession might be voluntary under traditional Fifth Amendment analysis." *Fare* v. *Michael C.*, 442 U. S. 707, 718 (1979). This pre-*Edwards* explanation applies as well to *Edwards* and its progeny. *Arizona* v. *Roberson, supra*, at 681–682.

The Mississippi Supreme Court relied on our statement in *Edwards* that an accused who invokes his right to counsel "is not subject to further interrogation by the authorities until counsel has been made available to him . . . ." 451 U. S., at 484–485. We do not interpret this language to mean, as the Mississippi court thought, that the protection of *Edwards* terminates once counsel has consulted with the suspect. In

context, the requirement that counsel be "made available" to the accused refers to more than an opportunity to consult with an attorney outside the interrogation room.

In *Edwards*, we focused on *Miranda*'s instruction that when the accused invokes his right to counsel, "the interrogation must cease until an attorney is *present*," 384 U. S., at 474 (emphasis added), agreeing with Edwards' contention that he had not waived his right "to have counsel *present* during custodial interrogation." 451 U. S., at 482 (emphasis added). In the sentence preceding the language quoted by the Mississippi Supreme Court, we referred to the "right to have counsel *present* during custodial interrogation," and in the sentence following, we again quoted the phrase " 'interrogation must cease until an attorney is *present*' " from *Miranda.* 451 U. S., at 484–485 (emphasis added). The full sentence relied on by the Mississippi Supreme Court, moreover, says: "We further hold that an accused, such as Edwards, *having expressed his desire to deal with the police only through counsel,* is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Ibid.* (emphasis added).

Our emphasis on counsel's *presence* at interrogation is not unique to *Edwards*. It derives from *Miranda,* where we said that in the cases before us "[t]he presence of counsel . . . would be the adequate protective device necessary to make the process of police interrogation conform to the dictates of the [Fifth Amendment] privilege. His presence would insure that statements made in the government-established atmosphere are not the product of compulsion." 384 U. S., at 466. See *Fare* v. *Michael C., supra,* at 719. Our cases following *Edwards* have interpreted the decision to mean that the authorities may not initiate questioning of the accused in counsel's absence. Writing for a plurality of the Court, for instance, then-JUSTICE REHNQUIST described the holding of

*Edwards* to be "that subsequent incriminating statements made *without [Edwards'] attorney present* violated the rights secured to the defendant by the Fifth and Fourteenth Amendments to the United States Constitution." *Oregon* v. *Bradshaw*, 462 U. S. 1039, 1043 (1983) (emphasis added). See also *Arizona* v. *Roberson, supra,* at 680 ("The rule of the *Edwards* case came as a corollary to *Miranda*'s admonition that '[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present'"); *Shea* v. *Louisiana*, 470 U. S. 51, 52 (1985) ("In *Edwards* v. *Arizona*, . . . this Court ruled that a criminal defendant's rights under the Fifth and Fourteenth Amendments were violated by the use of his confession obtained by police-instigated interrogation—without counsel present—after he requested an attorney"). These descriptions of *Edwards*' holding are consistent with our statement that "[p]reserving the integrity of an accused's choice to communicate with police only through counsel is the essence of *Edwards* and its progeny." *Patterson* v. *Illinois*, 487 U. S. 285, 291 (1988). In our view, a fair reading of *Edwards* and subsequent cases demonstrates that we have interpreted the rule to bar police-initiated interrogation unless the accused has counsel with him at the time of questioning. Whatever the ambiguities of our earlier cases on this point, we now hold that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney.

We consider our ruling to be an appropriate and necessary application of the *Edwards* rule. A single consultation with an attorney does not remove the suspect from persistent attempts by officials to persuade him to waive his rights, or from the coercive pressures that accompany custody and that may increase as custody is prolonged. The case before us well illustrates the pressures, and abuses, that may be concomitants of custody. Petitioner testified that though he resisted, he was required to submit to both the FBI and the

Denham interviews. In the latter instance, the compulsion to submit to interrogation followed petitioner's unequivocal request during the FBI interview that questioning cease until counsel was present. The case illustrates also that consultation is not always effective in instructing the suspect of his rights. One plausible interpretation of the record is that petitioner thought he could keep his admissions out of evidence by refusing to sign a formal waiver of rights. If the authorities had complied with Minnick's request to have counsel present during interrogation, the attorney could have corrected Minnick's misunderstanding, or indeed counseled him that he need not make a statement at all. We decline to remove protection from police-initiated questioning based on isolated consultations with counsel who is absent when the interrogation resumes.

The exception to *Edwards* here proposed is inconsistent with *Edwards'* purpose to protect the suspect's right to have counsel present at custodial interrogation. It is inconsistent as well with *Miranda*, where we specifically rejected respondent's theory that the opportunity to consult with one's attorney would substantially counteract the compulsion created by custodial interrogation. We noted in *Miranda* that "[e]ven preliminary advice given to the accused by his own attorney can be swiftly overcome by the secret interrogation process. Thus the need for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning if the defendant so desires." 384 U. S., at 470 (citation omitted).

The exception proposed, furthermore, would undermine the advantages flowing from *Edwards'* "clear and unequivocal" character. Respondent concedes that even after consultation with counsel, a second request for counsel should reinstate the *Edwards* protection. We are invited by this formulation to adopt a regime in which *Edwards'* protection could pass in and out of existence multiple times prior to ar-

raignment, at which point the same protection might reattach by virtue of our Sixth Amendment jurisprudence, see *Michigan* v. *Jackson*, 475 U. S. 625 (1986). Vagaries of this sort spread confusion through the justice system and lead to a consequent loss of respect for the underlying constitutional principle.

In addition, adopting the rule proposed would leave far from certain the sort of consultation required to displace *Edwards*. Consultation is not a precise concept, for it may encompass variations from a telephone call to say that the attorney is en route, to a hurried interchange between the attorney and client in a detention facility corridor, to a lengthy in-person conference in which the attorney gives full and adequate advice respecting all matters that might be covered in further interrogations. And even with the necessary scope of consultation settled, the officials in charge of the case would have to confirm the occurrence and, possibly, the extent of consultation to determine whether further interrogation is permissible. The necessary inquiries could interfere with the attorney-client privilege.

Added to these difficulties in definition and application of the proposed rule is our concern over its consequence that the suspect whose counsel is prompt would lose the protection of *Edwards*, while the one whose counsel is dilatory would not. There is more than irony to this result. There is a strong possibility that it would distort the proper conception of the attorney's duty to the client and set us on a course at odds with what ought to be effective representation.

Both waiver of rights and admission of guilt are consistent with the affirmation of individual responsibility that is a principle of the criminal justice system. It does not detract from this principle, however, to insist that neither admissions nor waivers are effective unless there are both particular and systemic assurances that the coercive pressures of custody were not the inducing cause. The *Edwards* rule sets forth a specific standard to fulfill these purposes, and we have de-

clined to confine it in other instances. See *Arizona* v. *Roberson*, 486 U. S. 675 (1988). It would detract from the efficacy of the rule to remove its protections based on consultation with counsel.

*Edwards* does not foreclose finding a waiver of Fifth Amendment protections after counsel has been requested, provided the accused has initiated the conversation or discussions with the authorities; but that is not the case before us. There can be no doubt that the interrogation in question was initiated by the police; it was a formal interview which petitioner was compelled to attend. Since petitioner made a specific request for counsel before the interview, the police-initiated interrogation was impermissible. Petitioner's statement to Denham was not admissible at trial.

The judgment is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE SOUTER took no part in the consideration or decision of this case.

JUSTICE SCALIA, with whom THE CHIEF JUSTICE joins, dissenting.

The Court today establishes an irrebuttable presumption that a criminal suspect, after invoking his *Miranda* right to counsel, can *never* validly waive that right during any police-initiated encounter, even after the suspect has been provided multiple *Miranda* warnings and has actually consulted his attorney. This holding builds on foundations already established in *Edwards* v. *Arizona*, 451 U. S. 477 (1981), but "the rule of *Edwards* is our rule, not a constitutional command; and it is our obligation to justify its expansion." *Arizona* v. *Roberson*, 486 U. S. 675, 688 (1988) (KENNEDY, J., dissenting). Because I see no justification for applying the *Edwards* irrebuttable presumption when a criminal suspect has actually consulted with his attorney, I respectfully dissent.

## I

Some recapitulation of pertinent facts is in order, given the Court's contention that "[t]he case before us well illustrates the pressures, and abuses, that may be concomitants of custody." *Ante,* at 153. It is undisputed that the FBI agents who first interviewed Minnick on Saturday, August 23, 1986, advised him of his *Miranda* rights before any questioning began. Although he refused to sign a waiver form, he agreed to talk to the agents, and described his escape from prison in Mississippi and the ensuing events. When he came to what happened at the trailer, however, Minnick hesitated. The FBI agents then reminded him that he did not have to answer questions without a lawyer present. Minnick indicated that he would finish his account on Monday, when he had a lawyer, and the FBI agents terminated the interview forthwith.

Minnick was then provided with an attorney, with whom he consulted several times over the weekend. As Minnick testified at a subsequent suppression hearing:

> "I talked to [my attorney] two different times and—it might have been three different times . . . . He told me that first day that he was my lawyer and that he was appointed to me and to not to talk to nobody and not tell nobody nothing and to not sign no waivers and not sign no extradition papers or sign anything and that he was going to get a court order to have any of the police—I advised him of the FBI talking to me and he advised me not to tell anybody anything that he was going to get a court order drawn up to restrict anybody talking to me outside of the San Diego Police Department." App. 46–47.

On Monday morning, Minnick was interviewed by Deputy Sheriff J. C. Denham, who had come to San Diego from Mississippi. Before the interview, Denham reminded Minnick of his *Miranda* rights. Minnick again refused to sign a

waiver form, but he did talk with Denham and did not ask for his attorney. As Minnick recalled at the hearing, he and Denham

> "went through several different conversations about — first, about how everybody was back in the county jail and what everybody was doing, had he heard from Mama and had he went and talked to Mama and had he seen my brother, Tracy, and several different other questions pertaining to such things as that. And, we went off into how the escape went down at the county jail . . . ." App. 50.

Minnick then proceeded to describe his participation in the double murder at the trailer.

Minnick was later extradited and tried for murder in Mississippi. Before trial, he moved to suppress the statements he had given the FBI agents and Denham in the San Diego jail. The trial court granted the motion with respect to the statements made to the FBI agents, but ordered a hearing on the admissibility of the statements made to Denham. After receiving testimony from both Minnick and Denham, the court concluded that Minnick's confession had been "freely and voluntarily given from the evidence beyond a reasonable doubt," *id.*, at 25, and allowed Denham to describe Minnick's confession to the jury.

The Court today reverses the trial court's conclusion. It holds that, because Minnick had asked for counsel during the interview with the FBI agents, he could not — as a matter of law — validly waive the right to have counsel present during the conversation initiated by Denham. That Minnick's original request to see an attorney had been honored, that Minnick had consulted with his attorney on several occasions, and that the attorney had specifically warned Minnick not to speak to the authorities, are irrelevant. That Minnick was familiar with the criminal justice system in general or *Miranda* warnings in particular (he had previously been convicted of robbery in Mississippi and assault with a deadly

weapon in California) is also beside the point. The confession must be suppressed, not because it was "compelled," nor even because it was obtained from an individual who could realistically be assumed to be unaware of his rights, but simply because this Court sees fit to prescribe as a "systemic assuranc[e]," *ante*, at 155, that a person in custody who has once asked for counsel cannot thereafter be approached by the police unless counsel is present. Of course the Constitution's proscription of compelled testimony does not remotely authorize this incursion upon state practices; and even our recent precedents are not a valid excuse.

## II

In *Miranda* v. *Arizona*, 384 U. S. 436 (1966), this Court declared that a criminal suspect has a right to have counsel present during custodial interrogation, as a prophylactic assurance that the "inherently compelling pressures," *id.*, at 467, of such interrogation will not violate the Fifth Amendment. But *Miranda* did not hold that these "inherently compelling pressures" precluded a suspect from waiving his right to have counsel present. On the contrary, the opinion recognized that a State could establish that the suspect "knowingly and intelligently waived . . . his right to retained or appointed counsel." *Id.*, at 475. For this purpose, the Court expressly adopted the "high standar[d] of proof for the waiver of constitutional rights," *ibid.*, set forth in *Johnson* v. *Zerbst*, 304 U. S. 458 (1938).

The *Zerbst* waiver standard, and the means of applying it, are familiar: Waiver is "an intentional relinquishment or abandonment of a known right or privilege," *id.*, at 464; and whether such a relinquishment or abandonment has occurred depends "in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused," *ibid.* We have applied the *Zerbst* approach in many contexts where a State bears the burden of showing a waiver of constitutional crimi-

nal procedural rights. See, *e. g.*, *Faretta* v. *California*, 422
U. S. 806, 835 (1975) (right to the assistance of counsel at
trial); *Brookhart* v. *Janis*, 384 U. S. 1, 4 (1966) (right to
confront adverse witnesses); *Adams* v. *United States ex rel.
McCann*, 317 U. S. 269, 275–280 (1942) (right to trial by
jury).

Notwithstanding our acknowledgment that *Miranda* rights
are "not themselves rights protected by the Constitution but
. . . instead measures to insure that the right against compul-
sory self-incrimination [is] protected," *Michigan* v. *Tucker*,
417 U. S. 433, 444 (1974), we have adhered to the principle
that nothing less than the *Zerbst* standard for the waiver of
constitutional rights applies to the waiver of *Miranda* rights.
Until *Edwards*, however, we refrained from imposing on the
States a *higher* standard for the waiver of *Miranda* rights.
For example, in *Michigan* v. *Mosley*, 423 U. S. 96 (1975), we
rejected a proposed irrebuttable presumption that a criminal
suspect, after invoking the *Miranda* right to remain silent,
could not validly waive the right during any subsequent ques-
tioning by the police. In *North Carolina* v. *Butler*, 441
U. S. 369 (1979), we rejected a proposed rule that waivers of
*Miranda* rights must be deemed involuntary absent an ex-
plicit assertion of waiver by the suspect. And in *Fare* v. *Mi-
chael C.*, 442 U. S. 707, 723–727 (1979), we declined to hold
that waivers of *Miranda* rights by juveniles are *per se*
involuntary.

*Edwards*, however, broke with this approach, holding that
a defendant's waiver of his *Miranda* right to counsel, made in
the course of a police-initiated encounter after he had re-
quested counsel but before counsel had been provided, was
*per se* involuntary. The case stands as a solitary exception
to our waiver jurisprudence. It does, to be sure, have the
desirable consequences described in today's opinion. In the
narrow context in which it applies, it provides 100% assur-
ance against confessions that are "the result of coercive pres-
sures," *ante*, at 151; it "'prevent[s] police from badgering a

·defendant,'" *ante*, at 150 (quoting *Michigan* v. *Harvey*, 494 U. S. 344, 350 (1990)); it "conserves judicial resources which would otherwise be expended in making difficult determinations of voluntariness," *ante*, at 151; and it provides "'"clear and unequivocal" guidelines to the law enforcement profession,'" *ibid.* (quoting *Arizona* v. *Roberson*, 486 U. S., at 682). But so would a rule that simply excludes all confessions by all persons in police custody. The value of any prophylactic rule (assuming the authority to adopt a prophylactic rule) must be assessed not only on the basis of what is gained, but also on the basis of what is lost. In all other contexts we have thought the above-described consequences of abandoning *Zerbst* outweighed by "'the need for police questioning as a tool for effective enforcement of criminal laws,'" *Moran* v. *Burbine*, 475 U. S. 412, 426 (1986). "Admissions of guilt," we have said, "are more than merely 'desirable'; they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law." *Ibid.* (citation omitted).

### III

In this case, of course, we have not been called upon to reconsider *Edwards*, but simply to determine whether its irrebuttable presumption should continue after a suspect has actually consulted with his attorney. Whatever justifications might support *Edwards* are even less convincing in this context.

Most of the Court's discussion of *Edwards*—which stresses repeatedly, in various formulations, the case's emphasis upon the "right 'to have counsel *present* during custodial interrogation.'" *ante*, at 152, quoting 451 U. S., at 482 (emphasis added by the Court)—is beside the point. The existence and the importance of the *Miranda*-created right "to have counsel *present*" are unquestioned here. What *is* questioned is why a State should not be given the opportunity to prove (under *Zerbst*) that the right was *voluntarily waived* by a suspect who, after having been read his *Miranda* rights twice and

having consulted with counsel at least twice, chose to speak to a police officer (and to admit his involvement in two murders) without counsel present.

*Edwards* did not assert the principle that no waiver of the *Miranda* right "to have counsel *present*" is possible. It simply adopted the presumption that no waiver is *voluntary* in certain circumstances, and the issue before us today is how broadly those circumstances are to be defined. They should not, in my view, extend beyond the circumstances present in *Edwards* itself—where the suspect in custody asked to consult an attorney and was interrogated before that attorney had ever been provided. In those circumstances, the *Edwards* rule rests upon an assumption similar to that of *Miranda* itself: that when a suspect in police custody is first questioned he is likely to be ignorant of his rights and to feel isolated in a hostile environment. This likelihood is thought to justify special protection against unknowing or coerced waiver of rights. After a suspect has seen his request for an attorney honored, however, and has actually spoken with that attorney, the probabilities change. The suspect then knows that he has an advocate on his side, and that the police will permit him to consult that advocate. He almost certainly also has a heightened awareness (above what the *Miranda* warning itself will provide) of his right to remain silent—since at the earliest opportunity "any lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to the police under any circumstances." *Watts* v. *Indiana*, 338 U. S. 49, 59 (1949) (opinion of Jackson, J.).

Under these circumstances, an irrebuttable presumption that any police-prompted confession is the result of ignorance of rights, or of coercion, has no genuine basis in fact. After the first consultation, therefore, the *Edwards* exclusionary rule should cease to apply. Does this mean, as the Court implies, that the police will thereafter have license to "badger" the suspect? Only if all one means by "badger" is asking, without such insistence or frequency as would constitute co-

ercion, whether he would like to reconsider his decision not to confess. Nothing in the Constitution (the only basis for our intervention here) prohibits such inquiry, which may often produce the desirable result of a voluntary confession. If and when postconsultation police inquiry becomes so protracted or threatening as to constitute coercion, the *Zerbst* standard will afford the needed protection.

One should not underestimate the extent to which the Court's expansion of *Edwards* constricts law enforcement. Today's ruling, that the invocation of a right to counsel permanently prevents a police-initiated waiver, makes it largely impossible for the police to urge a prisoner who has initially declined to confess to change his mind—or indeed, even to ask whether he has changed his mind. Many persons in custody will invoke the *Miranda* right to counsel during the first interrogation, so that the permanent prohibition will attach at once. Those who do not do so will almost certainly request or obtain counsel at arraignment. We have held that a general request for counsel, after the Sixth Amendment right has attached, also triggers the *Edwards* prohibition of police-solicited confessions, see *Michigan* v. *Jackson*, 475 U. S. 625 (1986), and I presume that the perpetuality of prohibition announced in today's opinion applies in that context as well. "Perpetuality" is not too strong a term, since, although the Court rejects one logical moment at which the *Edwards* presumption might end, it suggests no alternative. In this case Minnick was reapproached by the police three days after he requested counsel, but the result would presumably be the same if it had been three months, or three years, or even three decades. This perpetual irrebuttable presumption will apply, I might add, not merely to interrogations involving the original crime, but to those involving other subjects as well. See *Arizona* v. *Roberson*, 486 U. S. 675 (1988).

Besides repeating the uncontroverted proposition that the suspect has a "right to have counsel *present*," the Court stresses the clarity and simplicity that are achieved by to-

day's holding.   Clear and simple rules are desirable, but only in pursuance of authority that we possess.   We are authorized by the Fifth Amendment to exclude confessions that are "compelled," which we have interpreted to include confessions that the police obtain from a suspect in custody without a knowing and voluntary waiver of his right to remain silent. Undoubtedly some bright-line rules can be adopted to implement that principle, marking out the situations in which knowledge or voluntariness cannot possibly be established— for example, a rule excluding confessions obtained after five hours of continuous interrogation.   But a rule excluding all confessions that follow upon even the slightest police inquiry cannot conceivably be justified on this basis.   It does not rest upon a reasonable prediction that all such confessions, or even most such confessions, will be unaccompanied by a knowing and voluntary waiver.

It can be argued that the same is true of the category of confessions excluded by the *Edwards* rule itself.   I think that is so, but, as I have discussed above, the presumption of involuntariness is at least more plausible for that category. There is, in any event, a clear and rational line between that category and the present one, and I see nothing to be said for expanding upon a past mistake.   Drawing a distinction between police-initiated inquiry before consultation with counsel and police-initiated inquiry after consultation with counsel is assuredly more reasonable than other distinctions *Edwards* has already led us into—such as the distinction between police-initiated inquiry after assertion of the *Miranda* right to remain silent, and police-initiated inquiry after assertion of the *Miranda* right to counsel, see Kamisar, The *Edwards* and *Bradshaw* Cases: The Court Giveth and the Court Taketh Away, in 5 The Supreme Court: Trends and Developments 153, 157 (J. Choper, Y. Kamisar, & L. Tribe eds. 1984) ("[E]ither *Mosley* was wrongly decided or *Edwards* was"); or the distinction between what is needed to prove waiver of the

*Miranda* right to have counsel present and what is needed to prove waiver of rights found in the Constitution.

The rest of the Court's arguments can be answered briefly. The suggestion that it will either be impossible or ethically impermissible to determine whether a "consultation" between the suspect and his attorney has occurred is alarmist. Since, as I have described above, the main purpose of the consultation requirement is to eliminate the suspect's feeling of isolation and to assure him the presence of legal assistance, any discussion between him and an attorney whom he asks to contact, or who is provided to him, in connection with his arrest, will suffice. The precise content of the discussion is irrelevant.

As for the "irony" that "the suspect whose counsel is prompt would lose the protection of *Edwards*, while the one whose counsel is dilatory would not," *ante*, at 155: There seems to me no irony in applying a special protection only when it is needed. The *Edwards* rule is premised on an (already tenuous) assumption about the suspect's psychological state, and when the event of consultation renders that assumption invalid the rule should no longer apply. One searching for ironies in the state of our law should consider, first, the irony created by *Edwards* itself: The suspect in custody who says categorically "I do not wish to discuss this matter" can be asked to change his mind; but if he should say, more tentatively, "I do not think I should discuss this matter without my attorney present" he can no longer be approached. To that there is added, by today's decision, the irony that it will be far harder for the State to establish a knowing and voluntary waiver of Fifth Amendment rights by a prisoner who has already consulted with counsel than by a newly arrested suspect.

Finally, the Court's concern that "*Edwards'* protection could pass in and out of existence multiple times," *ante*, at 154, does not apply to the resolution of the matter I have pro-

posed. *Edwards* would cease to apply, permanently, once consultation with counsel has occurred.

\* \* \*

Today's extension of the *Edwards* prohibition is the latest stage of prophylaxis built upon prophylaxis, producing a veritable fairyland castle of imagined constitutional restriction upon law enforcement. This newest tower, according to the Court, is needed to avoid "inconsisten[cy] with [the] purpose" of *Edwards'* prophylactic rule, *ante*, at 154, which was needed to protect *Miranda*'s prophylactic right to have counsel present, which was needed to protect the right against *compelled self-incrimination* found (at last!) in the Constitution.

It seems obvious to me that, even in *Edwards* itself but surely in today's decision, we have gone far beyond any genuine concern about suspects who do not *know* their right to remain silent, or who have been *coerced* to abandon it. Both holdings are explicable, in my view, only as an effort to protect suspects against what is regarded as their own folly. The sharp-witted criminal would know better than to confess; why should the dull-witted suffer for his lack of mental endowment? Providing him an attorney at every stage where he might be induced or persuaded (though not coerced) to incriminate himself will even the odds. Apart from the fact that this protective enterprise is beyond our authority under the Fifth Amendment or any other provision of the Constitution, it is unwise. The procedural protections of the Constitution protect the guilty as well as the innocent, but it is not their objective to set the guilty free. That some clever criminals may employ those protections to their advantage is poor reason to allow criminals who have not done so to escape justice.

Thus, even if I were to concede that an honest confession is a foolish mistake, I would welcome rather than reject it; a rule that foolish mistakes do not count would leave most of-

fenders not only unconvicted but undetected. More fundamentally, however, it is wrong, and subtly corrosive of our criminal justice system, to regard an honest confession as a "mistake." While every person is entitled to stand silent, it is more virtuous for the wrongdoer to admit his offense and accept the punishment he deserves. Not only for society, but for the wrongdoer himself, "admissio[n] of guilt . . . , if not coerced, [is] inherently desirable," *United States* v. *Washington*, 431 U. S. 181, 187 (1977), because it advances the goals of both "justice *and* rehabilitation," *Michigan* v. *Tucker*, 417 U. S., at 448, n. 23 (emphasis added). A confession is rightly regarded by the Sentencing Guidelines as warranting a reduction of sentence, because it "demonstrates a recognition and affirmative acceptance of personal responsibility for . . . criminal conduct," U. S. Sentencing Commission, Guidelines Manual § 3E1.1 (1988), which is the beginning of reform. We should, then, rejoice at an honest confession, rather than pity the "poor fool" who has made it; and we should regret the attempted retraction of that good act, rather than seek to facilitate and encourage it. To design our laws on premises contrary to these is to abandon belief in either personal responsibility or the moral claim of just government to obedience. Cf. Caplan, Questioning *Miranda*, 38 Vand. L. Rev. 1417, 1471–1473 (1985). Today's decision is misguided, it seems to me, in so readily exchanging, for marginal, super-*Zerbst* protection against genuinely compelled testimony, investigators' ability to urge, or even ask, a person in custody to do what is right.