THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
CARY D. COLES, Defendant-Appellant.

First District (6th Division) No. 1—89—1122

Opinion filed July 19, 1991.

Carl M. Walsh and David Eckberg, both of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and David S. Meyerson, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

After a stipulated bench trial, the defendant, Gary Coles, was convicted of delivery of a controlled substance and possession of cannabis with intent to deliver; he was sentenced to six years on the delivery charge and two years on the possession charge, the sentences to be served concurrently.

The defendant first maintains that reversible error occurred when the judge denied the defendant's motion to suppress his statement and his motion to suppress evidence seized from his residence.

At the hearing on his motions to suppress, the defendant testified that on Friday, July 17, 1987, at approximately 3 p.m. he was arrested by Wilmette police officer John Provost and taken to the Wilmette police department. He was advised of his rights and asked Provost for an attorney and to make a phone call. Provost responded, "You haven't been booked yet, and you cannot make a call until you have been booked and we can keep you here for hours." The defendant signed a waiver of *Miranda* rights, but put "No" next to the question, "Having these rights in mind, do you wish to talk to me/us?" Provost continued to talk to the defendant. He said the defendant was going to be incarcerated for a long time and if the defendant did not talk to him and submit to an apartment search, he would be put in jail that evening and would not be allowed to leave custody. The defendant was also told he would not get a bond hearing until the following Monday because the courts were closed over the weekend and that the bond set would be very high. Provost continued talking for approximately 1 hour and 45 minutes.

The defendant testified that "at that point, after being told that I would be going to Cook County Jail for the weekend, I told Officer Provost anything he wanted to hear to get out of there. Officer Provost agreed to get me a very inexpensive bail to get me out of there." Provost told the defendant that if he did not sign a consent-to-search form, a search warrant would be obtained anyway, and the authorities would go to his apartment, which was located at 600 South Dearborn in Chicago, arrest anyone there and tear the apartment apart. Provost asked the defendant if he had ever seen what happens to an apartment or what a home could look like after it has been searched by the police. The defendant again asked Provost if he could speak with his attorney, and Provost said he could not until he signed the consent to search his apartment. Provost also said that once the search was conducted, the defendant could make a phone call. The defendant then signed the consent-to-search form.

On cross-examination, the defendant said he knew he was under arrest for delivery of almost 29 grams of cocaine. After he had been arrested, an agent of the Metropolitan Enforcement Group (MEG) named Martinez came up to the police car, "smacked" the defendant and said, "You have met MEG." While he was in a room at the Wilmette police station, officers were coming in and out of the room. He admitted that he told Provost that he would speak with Provost because he was from the Wilmette police and he knew Provost would not treat him like the officers from the MEG unit. The defendant said he did not feel comfortable talking with Provost, but he did not have much of a choice at that point after having been denied a phone call or an attorney. He told another police officer where he lived and whether he was a registered voter. He further testified that he was not surprised when told that he could be held over the weekend in Cook County jail and that bond could be rather high.

Officer Provost testified that he arrested the defendant at 525 Pinecrest in Wilmette at approximately 1:55 p.m. Present at the scene were other officers from the Wilmette police department and officers from MEG. MEG Agent Martinez read the defendant his *Miranda* rights from a preprinted card. The defendant was transported to the Wilmette police department in handcuffs. Provost next saw the defendant shortly after 2 p.m. in the Wilmette police station booking room. Provost entered the room and uncuffed the defendant. Provost, who was alone in the room with the defendant, read the defendant his *Miranda* rights from a poster on the wall. The defendant asked Provost what agency he belonged to, and Provost answered that he was with the Wilmette police department. The defendant then

stated, "That's fine. I'll talk to you but I'm not going to talk to the MEG guys. I know they will try to fuck me over, and you won't." The defendant volunteered to cooperate and do anything to assist Provost, but repeated that he would not speak with the MEG people.

MEG Agent Selecki entered the room and told the defendant that he needed to get some information from him to fill out a personal history form. The defendant asked Selecki who he was, and Selecki answered that he was a MEG agent. The defendant said that he did not want to speak to any MEG agents. Selecki read the defendant his *Miranda* rights from a preprinted form. At approximately 2:10 p.m., the defendant signed a waiver of *Miranda* rights form but put "No" after the question that asked whether he wished to talk to them. Selecki told the defendant that he needed to fill out the form even if the defendant was unwilling to speak with him. Among other things, Selecki asked the defendant his name, address, phone number and acquaintances. The defendant also told Selecki the name of his attorney, but never requested permission to call him.

Provost then booked the defendant for the Wilmette police department and for MEG by taking fingerprints and photographs. The booking procedure took approximately one half hour. Selecki left the room between 2:30 to 3 p.m. The defendant again stated that he wanted to talk to the Wilmette police department, but not MEG. Provost told the defendant that he was not required to talk to Provost or MEG. The defendant related information to Provost about how he could be helpful to the Wilmette police department in return for reduction of his charges.

Provost informed the defendant that he had other information regarding the defendant, his narcotics ventures, and his apartment. He also told the defendant that it was possible that the authorities would be seeking to go to his apartment. He told the defendant that the information was derived from a confidential informant, who told the authorities that he had been in the defendant's apartment and had seen quantities of cocaine and cannabis there. The informant, according to Provost, also informed authorities that in phone conversations on July 17 the defendant indicated that he had large quantities of drugs and offered to bring more than what he had actually brought. Provost told the defendant that the authorities were going to contact the State's Attorney's office, make an application to search his apartment, and that he and fellow officers would go down to his apartment. The defendant told Provost that he wished that he would not do that because there was an employee working in his apartment and he did not want the police to break down the door and rip the place up. The

defendant also stated his concern for his furniture and that he did not want his employee to get arrested.

At approximately 3 p.m., Provost asked the defendant to sign a permission-to-search form. The defendant asked Provost when he could leave the station, and Provost responded that nothing could occur until the investigation was complete and that he could not leave if they were in the process of getting a search warrant for his apartment; that might take several hours. Provost also told the defendant that, since it was past 3 p.m., they would have to get a bond judge when they were finished with the investigation. At that point, the defendant signed the permission-to-search form. He later accompanied the police to the apartment and was present during the search.

On cross-examination Provost testified that, before the defendant signed the consent-to-search form, Provost told the defendant that the investigation could take hours. Provost testified that the form the defendant signed was a "MEG" form because the form usually used by the Wilmette police was being redrafted at that time; no Wilmette police forms were available.

In his ruling denying the motions to suppress, the judge said that it was "a question of credibility," that the court had had an opportunity "both to hear the evidence and to observe the demeanor" of both the defendant and the police officers. He concluded that the State had "by clear and convincing evidence" shown that it was a "totally voluntary type of cooperation on the part of the defendant and that any problem that he had in discussing the matter with MEG did not exist in discussing the matter with the Wilmette police department."

Contrary to the defendant's argument, we agree with the judge's determination that this case depends on the credibility of the witnesses. That being so, the question is reduced to this: Accepting the testimony of Officer Provost as true, was the defendant's subsequent statement to Provost inadmissible, as a matter of law, as the defendant contends?

■ The defendant's entire argument is based on the supposition that once he indicated on the waiver-of-rights form that he did not wish to answer any questions, *all* questioning by *all* law enforcement officials was barred, as a matter of law. We do not accept that supposition. In *Edwards v. Arizona* (1981), 451 U.S. 477, 486 n.9, 68 L. Ed. 2d 378, 387 n.9, 101 S. Ct. 1880, 1885 n.9, the Supreme Court held as follows:

"If, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly

would be 'interrogation.' In that event, the question would be whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including *the necessary fact that the accused, not the police, reopened the dialogue with the authorities.*" (Emphasis added.)

Officer Provost's testimony established the "necessary fact" that the defendant "reopened the dialogue with the authorities." By his own admission, both before and after the defendant refused to talk to the MEG agent, he told Provost he would talk to him. In fact, he even volunteered to cooperate with Provost. After the MEG agent left the room, the defendant again stated that he wished to speak with the Wilmette police department and not MEG. Subsequently, he, to use his own words, "told Officer Provost anything he wanted to hear." Under the circumstances, we find no error in the judge's denial of the motion to suppress the defendant's oral statement.

The defendant has cited the additional authority of *Minnick v. Mississippi* (1990), 498 U.S. 146, 112 L. Ed. 2d 489, 111 S. Ct. 486, which we find to be inapposite. In *Minnick*, the defendant was arrested by California police for murders committed in Mississippi. The next day he answered some questions asked by two FBI agents. He refused to answer all their questions but told them to return two days later after he had talked to his attorney. He said he would have a more complete statement then with his lawyer present. After the defendant conferred with his appointed lawyer, who told him to answer no questions and to sign nothing, he was questioned by a deputy sheriff from Mississippi, who advised him of his rights. The defendant refused to sign a rights waiver form but told the deputy about the facts of the murders. The Mississippi Supreme Court upheld admission of the deputy's testimony reasoning that the requirements of *Edwards* had been satisfied because the subsequent questioning *initiated by the authorities* occurred after the defendant had consulted with an attorney. The United States Supreme Court disagreed, stating, "We decline to remove protection from *police-initiated questioning* based on isolated consultations with counsel who is absent when the interrogation resumes." (Emphasis added.) (498 U.S. at 154, 112 L. Ed. 2d at 498, 111 S. Ct. at 491.) However, the court added this decisive observation:

> "*Edwards* does not foreclose finding a waiver of Fifth Amendment protections after counsel has been requested, *provided the accused has initiated the conversations or discussions*

*with the authorities*; but that is not the case before us. There can be no doubt that the interrogation in question was initiated by the police; it was a formal interview which petitioner was compelled to attend. Since petitioner made a specific request for counsel before the interview, the police-initiated interrogation was impermissible." (Emphasis added.) 498 U.S. at 156, 112 L. Ed. 2d at 499, 111 S. Ct. at 492.

The overriding difference between the case before us and *Minnick* (and *Edwards*) is that the resumption of the dialogue between the defendant and the police was initiated by the defendant, not the police. Both *Edwards* and *Minnick* centered on the right to counsel, but their reasoning is applicable to the right to remain silent.

Turning now to the question of his signing of the consent-to-search form, it is appropriate to identify the precise issue as posited by the defendant. In both this court and the trial court his argument is and was that he gave his consent only because of deception on the part of Provost. In his motion to suppress the evidence seized from his residence, he expressly maintained the following:

"2. Said officers thereafter deliberately lied to and deceived defendant by telling him they would be able to obtain a search warrant for his apartment in Chicago and would break in said apartment, search and destroy items, and arrest anyone there. At said time said officers well knew they had no probable cause for a search warrant.

3. Based upon said deceit, defendant signed a consent to search. Defendant's action on signing said consent was involuntary and based upon the police officer's deception."

We could sustain the judge's ruling on the ground that the defendant has failed to establish any "deception," even if we accepted the defendant's testimony. He testified that Provost said he would get a search warrant; that is not a misrepresentation of an existing fact; nor is the alleged statement of Provost that the police would tear up his apartment. Further, the evidence does not establish that the police could not have obtained a search warrant and there is no showing that the police knew that "they had no probable cause for a search warrant." Lest there be any doubt in the matter, however, we find that the evidence establishes that the signing of the consent form was but evidence of the overall conduct of the defendant indicating a desire to cooperate with the police in the hope of receiving a low bond, an earlier release and mitigation of the charges against him. Consequently, we find no error in the judge's determination that the defendant voluntarily consented to the search of his apartment.

The defendant's other contention is that the State's evidence violated the due process clause for reasons we will discuss after a recitation of the evidence.

Before July 17, Provost met with a confidential informant, Park Chambers, who told Provost he could arrange a delivery of an ounce of cocaine for $1,400. He and MEG agents interviewed Chambers and made arrangements for the delivery of cocaine on July 17.

Pursuant to those arrangements, on July 17, Provost and MEG Agents Martinez and Livas were present at 525 Pinecrest in Wilmette. It was a single-family residence owned by Chambers. At approximately 1:30 p.m., Martinez entered the residence with Chambers and, after searching the residence to make sure no one else was present, "secured it." Martinez had fourteen $100 bills on his person. The defendant arrived on a motorcycle between 1:52 and 1:55 p.m. and entered the residence. The defendant asked Martinez and Chambers, who were standing together in the living room, whether they had the money. Martinez said yes and pulled the $1,400 from his pocket and tried to hand it to the defendant. The defendant pointed to Chambers, and Martinez handed the money to Chambers, who in turn handed the money to the defendant. At that point, the defendant removed a white envelope from his pocket which contained a ziplock baggy holding approximately 27.34 grams of cocaine. The defendant put the cocaine in the hands of Chambers, who in turn put it in the hands of Martinez. Chambers and the defendant went into the kitchen while Martinez inspected the envelope.

At approximately 1:56 p.m., Martinez signaled to the police outside by means of an electronic device. At that point, Provost and Livas entered the dwelling and went into the kitchen area, where Livas patted down the defendant. Martinez recovered the $1,400 from a bulge in defendant's pocket and read the defendant *Miranda* warnings. The defendant was transported to the Wilmette police station. Martinez gave the bag of cocaine to Provost, who performed a field test and determined that it was cocaine.

At the station the defendant was questioned as to what was in his apartment, and he responded that there was marijuana, a small amount of cocaine and a pistol. He said that he was not a user but sold cocaine to make money. He also said that he entered Chambers' house, placed the cocaine on the table and was handed the money by Chambers. He discussed his many drug contacts, and offered to lead police to drug dealers with great quantities; he would be able to set up a deal for a "kilo" of cocaine; he had many other sources most of which were in the City of Chicago. Provost told the defendant that if

he wanted to help the police in furthering drug investigations, they would seek the approval of the State's Attorney's office.

The defendant accompanied the police to his apartment at 600 South Dearborn Street in Chicago. During the trip he volunteered statements to the police in which he said he knew a lot of people in the Wilmette area who were dealing drugs; he offered to take the officers to bars in the Rush Street area because many of his contacts were located there.

During the search of the defendant's apartment, the police found a sieving device with .49 grams of cocaine, two ziplock bags containing cocaine residue and a bag containing 325.2 grams of cannabis.

The defendant testified by stipulation that he was 21 years of age; that he is in the printing business; that on July 17, he went to the residence of Chambers, and encountered Chambers and another man whom he did not know at that time; that he asked Chambers for some money; the other man produced the money and gave it to Chambers; and then he and Chambers went into the kitchen, where he received the money from Chambers. The defendant had never been convicted of a crime.

The defendant also established that in 1987 Chambers had been convicted of possession of a controlled substance which was reduced from delivery of a controlled substance and of theft.

The defendant contends that his due process rights were violated because: (1) a search of the premises where a "controlled buy" is to take place must be made to ascertain the presence or absence of a controlled substance; (2) a search must be made of the informant to ascertain whether or not the informant is in possession of a "controlled substance"; and (3) the State must produce an affidavit or testimony by the officer that he did not have in his possession any controlled substance before the "controlled buy." He argues that none of those requirements is present in this case.

Many cases have discussed the question of sufficiency of evidence where the sale of a controlled substance was made to an addict-informer; and reviewing courts have not hesitated to reverse convictions where the testimony of the addict-informer was deemed inadequate. (See *e.g., People v. Bazemore* (1962), 25 Ill. 2d 74, 182 N.E.2d 649; *People v. Dade* (1969), 109 Ill. App. 2d 337, 248 N.E.2d 844; *People v. Jackson* (1968), 103 Ill. App. 2d 123, 243 N.E.2d 414.) All cases, whether affirmances or reversals, have been decided on the basis of whether the proof was sufficient to establish guilt beyond a reasonable doubt. No case purports to enunciate bright-line rules as to

what procedures must be followed to pass constitutional muster. Consequently, we reject the defendant's argument that the procedures followed violated the defendant's right to constitutional due process.

██ Moreover, the evidence did not establish a "controlled buy" as that term is ordinarily understood in the context of transactions involving narcotics. In a "controlled buy" the party making the purchase is an addict-informer. (See *People v. Frank* (1964), 51 Ill. App. 2d 251, 256, 201 N.E.2d 197.) The police do not actively participate in the purchase. However, a reading of all the cases analyzing evidence of controlled buys teaches that courts are concerned with the credibility of the informer-purchaser. That concern is not relevant here because Chambers' credibility is not involved.

██ The case before us is subject to the same test applicable in all criminal cases: Does the record establish guilt beyond a reasonable doubt? The State's case was overwhelming. In addition to Martinez' testimony of the transaction itself and the recovery of the marked money, there are the defendant's confession and corroborating physical evidence of other cocaine found in his apartment.

For all these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA and LaPORTA, JJ., concur.