JOINER, Judge,
concurring specially.
I agree with the conclusion in the main opinion that “[Joey A.] Grizzell’s statement on September 5, 2013, was taken in violation of Edwards[ v. Arizona, 451 U.S. 477 (1981), and that] the circuit court abused its discretion by denying Grizzell’s motion to suppress.” 186 So.3d at 483. I write separately, however, to express my reasons for concurring in the main opinion.
In Maryland v, Shatzer, 559 U.S. 98, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010), the United States Supreme Court addressed the Edwards rule as follows:
“The Fifth Amendment, which applies to the States by virtue of the Fourteenth Amendment, Malloy v. Hogan, 378 U.S. 1, 6 (1964), provides that ‘[n]o person ... shall be compelled in any criminal case' to be a witness against himself.’ U.S. Const., Arndt. 5.' In Miranda v. Arizona, 384 U.S. 436 (1966), the Court adopted a set of prophylactic measures to protect a suspect’s Fifth Amendment right from' the ‘inherently compelling pressures’ of custodial interrogation. Id., at 467. The Court observed that ‘incommunicado interrogation’ in an ‘unfamiliar,’ ‘police-dominated atmosphere,’ id.,, at 456-457, involves psychological pressures-‘which work to undermine the individual’s will to resist and to compel him to speak where he would not otherwise do so freely,’ id., at 467. Consequently, it reasoned,.‘[u]nless -adequate *484 protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice.’ Id., at 458.
“To counteract the coercive pressure, Miranda announced that police officers must warn a suspect prior to questioning that he has a right to remain silent, and a right to the presence of an attorney. Id., at 444. After the warnings are given, if the suspect indicates that he wishes to remain silent, the interrogation must cease. Id., at 473-474. Similarly, if the suspect states that he wants an attorney, the interrogation must cease until an attorney is present. Id., at 474. Critically, however, a suspect can waive these rights. Id., at 475. To establish a valid waiver, the Státe must show that the waiver was knowing, intelligent, and voluntary under the ‘high standard] of proof for the waiver of constitutional rights [set forth in] Johnson v. Zerbst, 304 U.S. 458 (1938).’ Id., at 475.
“In Edwards, the Court determined that Zerbst’s traditional standard for waiver was not sufficient to protect a suspect’s right to have counsel present at a subsequent interrogation if he had previously requested counsel; ‘additional safeguards’ were necessary. 451 U.S., at 484. The Court therefore superimposed a ‘second layer of prophylaxis,’ McNeil v. Wisconsin, 501 U.S. 171, 176 (1991). Edwards held:
“ ‘[W]hen an accused has invoked his •right to have counsel present during custodial interrogation; a valid waiver of that right cannot be established by showing only that he responded- to further police-initiated custodial interrogation even if he has been advised of his rights.... [He] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.’ 451 U.S., at 484-485.
“The rationale of Edwards is that once a suspect indicates that ‘he is not capable of undergoing [custodial] questioning without advice of counsel,’ ‘any subsequent waiver that has come at the authorities’ behest, and not at the suspect’s own instigation, is itself the product of the “inherently compelling pressures” and not the purely voluntary choice of the suspect.’ Arizona v. Roberson, 486 U.S. 675, 681 (1988). Under this rule, a voluntary Miranda waiver is sufficient at the time of an initial attempted interrogation to protect a suspect’s right to have counsel present, but it is not sufficient at the time of subsequent attempts if the suspect initially requested the presence of counsel. The implicit assumption, of course, is that the subsequent requests for interrogation pose a significantly greater risk of coercion. That increased, risk results not only from the police’s persistence in trying to get the suspect to talk, but also from the continued pressure that begins when the individual is taken into custody as a suspect and sought to be interrogated — pressure likely to ‘increase as custody is prolonged,’ Minnick v. Mississippi, 498 U.S. 146, 153 (1990). The Edwards presumption of involuntariness ensures that police will not take advantage of the mounting coercive pressures of ‘prolonged police custody,’ Roberson, 486 U.S., at 686, by repeatedly attempting to question a suspect who previously requested counsel until the suspect is *485 ‘badgered into submission,’ id., at 690 (KENNEDY, J., dissenting). ■
“It is easy to believe that a suspect may be coerced or badgered into abandoning his earlier refusal to be questioned without counsel in the paradigm Edwards case. That is a case in which the suspect has been arrested for a particular crime and is held in uninterrupted pretrial custody while that crime is being actively investigated. After the initial interrogation, and up to and including the second one, he remains cut off from his normal life and companions, ‘thrust into’ and isolated in an ‘unfamiliar,’ ‘police-dominated atmosphere,’ Miranda, 384 U.S., at 456-457, where his captors ‘appear to control [his] fate,’ Illinois v. Perkins, 496 U.S. 292, 297 (1990). That was the situation confronted by the suspects in Edwards, Roberson, and Minnick, the three cases in which we have held the Edwards rule applicable. Edwards was arrested pursuant to a warrant and taken to a police station, where he was interrogated until he-requested counsel. Edwards, 451 U.S., at 478-479. The officer ended the interrogation and took him to the county jail, but at 9:15 the next morning, two of the officer’s colleagues reinterrogated. Edwards at the jail. Id., at 479. Roberson was arrested ‘at the scene of a just-eompileted burglary’ and interrogated there until he requested a lawyer. Roberson, 486 U.S., at 678. A different officer interrogated him three days later while he “was still in custody pursuant to the arrest.’ Ibid. Minnick was arrested by local police and taken to the San Diego jail, where two FBI agents interrogated him the next morning until he requested -counsel. Minnick, 498 U.S., at 148-149. Two days-later a Mississippi Deputy Sheriff reinterrogated him at the jail. Id., at 149. None of these suspects regained a sense of control or normalcy after they were initially taken into custody for the crime under investigation.”
559 U.S. at 103-07 (footnote omitted). The United States Supreme.Court, however, has declined to extend the Edwards rule to those cases in which there has been a - 14-day break in “Miranda custody.” See Shatzer, 559 U.S. at 109—11.[5] .
Thus, Edwards is violated if, once an accused invokes his right to counsel, one of the following occurs: (1) law enforcement does not cease interrogation, see United States v. Gomez, 927 F.2cl 1530 (11th Cir. 1991); (2) law enforcement reinitiates contact with the áceused to reinterrogate the accused without a sufficient break in “Miranda custody,” see Edwards, supra, and Shatzer, supra; or (3) the accused reiniti-ates contact'with law enforcement, but the accused does not knowingly and intelligently waive the right he had previously invoked, see Smith v. Illinois, 469 U.S. 91, 95, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984).
The main opinion, relying on Gomez, supra, concludes, that an Edwards violation occurred because Sheriff Bill Franklin’s “.comments constituted an interrogation after Grizzell had requested counsel.” 186 So.3d at 483. Gomez involved an instance in which law enforcement failed to cease its. interrogation after the accused had invoked his right to counsel. Here, however, as the main opinion delineates, law enforcement immediately ceased its interrogation when Grizzell invoked his *486 right to counsel bn September 4, 2013. Although this case is factually distinguishable from Gomez in that respect, Gomez nevertheless is instructive as to the crucial inquiry in this case: whether law enforcement’s subsequent interaction with Griz-zell, who had previously invoked his right to counsel, was an “interrogation” and therefore a reinitiation of contact in violation of Edwards,
. The main opinion correctly sets out the relevant facts as follows:
“On September 4, 2013, -law-enforcement officials placed- Grizzell under arrest and informed him of his Miranda rights. Grizzell waived his Miranda rights and signed a form indicating that he wished to speak to the investigatory regarding his case. Shortly thereafter, Grizzell invoked his right to counsel and the investigators ceased questioning him. Griz-zell was then booked into the Elmore County jail.
“On September 5, 2013, Grizzell’s family arrived at the jail seeking information about his case and asking to speak with him. Sgt. Troy, Evans went to Grizzell’s cell and .informed him that his family was there and asked .him if he wanted to speak with them. Grizzell replied, ‘Yes.’ (R. 15.) While Grizzell’s family was waiting on Grizzell to arrive, Sheriff Bill Franklin told Grizzell’s family that Grizzell was under arrest be- '■ cause the results of the autopsy differed from 'Grizzell’s initial statement. Sheriff Franklin also told Grizzell’s family that it would be in Grizzell’s best interest to give a statement. When asked during the suppression hearing if he made that comment to the family, Sheriff Franklin replied: Tes, I believe you’re familiar with my antics on that, you had one of your own clients that did that.’ (R. 46.)
“Afterwards, Sgt. Evans led Grizzell into the sheriffs office, where his family was waiting.- Sheriff Franklin then read Grizzell his Miranda rights and asked if he had an attorney. Grizzell replied that he did not. Sheriff Franklin then spoke with Grizzell,
“ ‘[t]o let him know that ' [Sheriff Franklin] had talked to his mother and some of our concerns. [Sheriff Franklin] told [Grizzell he] was not there that night, [Sheriff Franklin] do[es] not know what happened that night, but that [the sheriffs office] had a forensic pathologist that was going to say one thing that was far and wide froni what [Grizzell]- had alleged on that particular night....’
“(R. 41.) After the sheriff spoke with Grizzell and his family, Grizzell’s' mother stated that ‘[the family] knew this was an accident, but if he had left anything out of his statement [then] he needed to clear that up and clarify it.’ (R. 17.) Sheriff Franklin then walked away, and Grizzell was allowed' to speak with his family for approximately five to seven minutes. After speaking with his family, Grizzell stated that he wanted to speak to investigators about some facts that he had left ‘out of his initial 'statements. The investigators took him into ■another room and read Grizzell his Miranda rights. Grizzell waived his Miranda rights and provided a more detailed statement in which he admitted to causing additional injuries to Keller.”
186 So.3d at 480-81 (footnote omitted). Thus, under the facts of this case, Sheriff Franklin did not directly “question” Griz-zell or tell Grizzell that he needed to make a statement.
In Gomez, however, the United States Court of Appeals for the Eleventh Circuit explained that “[i]nterrogation ... means ‘any words or actions on the part of the police (other than those normally attendant to arrest and-custody) that the police *487 should know are reasonably likely to elicit an incriminating response from the suspect.’ [Rhode Island v.] Innis, [446 U.S. 291, 301,] 100 S.Ct. [1682] at 1689-90 [ (1980) ] (footnotes omitted).” Gomez, 927 F.2d at 1538. Thus, in this case, the question is whether Sheriff Franklin’s “antics” were “reasonably likely to elicit an incriminating response” from Grizzell.
As set out above, Sheriff Franklin essentially made three separate comments that were arguably impermissible. The first comment occurred before Grizzell was present — specifically, Sheriff Franklin “told Grizzell’s family that it would be in Grizzell’s best interest for him to give a statement,” 186 So.3d at 480. The second and third comments occurred after Grizzell had arrived — specifically, “Sheriff Franklin read Grizzell his Miranda rights,” 186 So.3d at 483, and “discussed his concerns and informed Grizzell that the autopsy refuted Grizzell’s initial statement.” 186 So.3d at 483.
Because the first comment occurred outside Grizzell’s presence, that comment was neither a reinitiation of contact with Griz-zell, nor was it “likely to elicit an incriminating response” from Grizzell; thus, that comment, standing alone, was not an Edwards violation.[6] The second comment— Sheriff Franklin’s reading Grizzell his Miranda rights — involved merely words “normally attendant with arrest and custody.” See Gomez, swpra. That comment standing alone, therefore, does not constitute an “interrogation,” because Miranda warnings are not “reasonably likely to elicit an incriminating response” from Grizzell. Sheriff Franklin’s reading Grizzell his Miranda rights, however, was clearly a reini-tiation of contact with Grizzell after Griz-zell had previously invoked his right to counsel. Had the contact stopped at this point, there would have been no Edwards violation in this case.[7] But Sheriff Franklin’s third comment — that he had “concerns” about Grizzell’s previous inconsistent statements — clearly falls within the Gomez definition of “interrogation” as that statement was, as the main opinion correctly recognizes, “reasonably likely' to elicit an incriminating response,” 927 F.2d at 1538, and served no purpose other than to convince Grizzell" to make -an additional statement after Grizzell had previously invoked his right to counsel.
In sum, under the circumstances of this case, Sheriff Franklin’s reading Grizzell his Miranda warnings constituted, a reini-tiation of contact with Grizzell, which, upon Sheriff. Franklin’s making comments to Grizzell about his “concerns” with Griz-zell’s case, became an impermissible reini-tiation of contact with Grizzell in violation of Edwards.
I also write specially to provide additional guidance as to the main opinion’s instruction that this case be “remanded for further proceedings.” -186 So.3d at 483. Although Grizzell was originally indicted for murder, see § 13A-6-2, Ala.Code 1975, Grizzell pleaded guilty, pursuant to a negotiated plea agreement, to the lesser-included offense of manslaughter, see § 13A-6-3, Ala.Code 1975. Because this Court holds that the circuit court erred in denying *488 Grizzell’s motion to suppress, this Court, as a result of its holding, is also setting aside GrizzeU’s- negotiated guilty-plea com viction for manslaughter and his resulting sentence of 16 years’ imprisonment. Because Grizzell’s negotiated plea agreement has been-set aside by this Court, the State may now reinstate the original,, murder indictment and proceed to trial on that indictment.[8] See Sheffield v. State, 959 So.2d 692, 695 (Ala.Crim.App.2006) (“ ‘The courts that have approved the reinstatement of dismissed charges after the vacation of a guilty plea seem to imply that this is a valid remedy due to the conditional nature of dismissed charges resulting from a guilty plea. When charges are dismissed as a part of a plea bargain agreement, the dismissal of the charges is conditioned upon the defendant being convicted and remaining convicted of the offense to which he pled guilty. [United States v.] Anderson, [514 F.2d 583 (7th Cir.1975) ]. When the State dismisses a charge pursuant to a plea agreement, it does so relying on the fact that the defendant will plead guilty to the remaining charge or charges and that his conviction will stand.’ ” (quoting Williams v. State, 494 So.2d 819, 824’ (Ala.Crim.App.1986))).
Based on these reasons, I concur with this Court’s judgment.
BURKE, J., concurs.

. This is commonly referred to as the "break-in-custody” exception to the Edwards rule— an exception that, as the main opinion correctly recognizes, is not applicable in this case. ' - ■

. To be clear, I do not intend this to be read as implying that law enforcement speaking with , family members may not, under .any circumstance, be considered to be an Edwards violation. Indeed, I can envision some circumstances under which such comments to family members of the 'accused may rise to that level.

. For example, because law enforcement was going to remain in the room with Grizzell and his family, had Sheriff Franklin merely reminded Grizzell of his Miranda rights and immediately allowed Grizzell to speak with ⅛ femil j do not believe there would have been an impermissible reinitiation of contact.

. Additionally, I do not read this Court’s decision to suppress Grizzell’s September 5, 2013, . statement as being fatal to the. State’s case against Grizzell.