Randall S. BRUNSON *v.* STATE of Arkansas

CA CR 92-391                                   848 S.W.2d 936

Court of Appeals of Arkansas
Division I
Opinion delivered February 24, 1993

40

*C. Scott Clark*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Kent G. Holt*, Asst. Att'y Gen., for appellee.

JOHN MAUZY PITTMAN, Judge. Randall S. Brunson appeals from his conviction of second-degree murder, for which he was sentenced to fifteen years in the Arkansas Department of Correction. He argues only that the trial court erred in denying his motion to suppress pretrial custodial statements given to the police. We find no error and affirm.

The evidence at the hearing on appellant's motion indicates that early on the morning of March 16, 1991, police officers discovered the body of Lonnie Barlow. He had been shot in the head with a large caliber weapon. Based on information gathered from the victim's brother about the victim's last known whereabouts, appellant and four acquaintances were contacted that evening and voluntarily agreed to go to the sheriff's department for interviews. At approximately 9:30 p.m., appellant, who was nineteen years old and did not appear intoxicated or otherwise impaired, was given *Miranda* warnings from a written form. According to Sheriff Jess Odom, appellant acknowledged that he understood those rights as read to him. He also indicated that he understood the waiver of rights provision read to him, and he signed the waiver at the end of the form. Appellant was then interviewed by Sheriff Odom and Chief Deputy Alton Boyd. The interview lasted less than an hour, ending around 10:30 p.m., during which appellant gave no statement that in any way implicated him in the murder. After the interview, appellant was considered only a witness.

Within moments after that initial interview, the sheriff was provided with additional information making appellant a suspect. Appellant was then interviewed a second time. At approximately 11:00 p.m., less than one-half hour after that interview began, appellant stated to the officers that they earlier had told him that he could have an attorney. At this point, according to the officers, the interview concluded, appellant was provided a telephone, telephone book, and instructions on how to reach an outside line, and the officers left the room.

At 1:15 a.m. on the morning of March 17, Sheriff Odom and

Lt. Steve Dozier re-entered the room, and appellant was informed by Sheriff Odom that he was going to be held overnight. The sheriff then left the room. According to Lt. Dozier, who was going to escort appellant to the jail, appellant began asking why he was being held. Lt. Dozier told him that the investigation had ended for the night and that the officers felt that they had probable cause to believe that he had killed the victim. Appellant stated that the officers were wrong and that he wanted to give his version of what had happened. Lt. Dozier told appellant that he was not allowed to question him further and that if appellant wanted to discuss the matter he would have to initiate any further conversation. According to Dozier, appellant was "insistent upon giving his version" of the events. Dozier then gave appellant *Miranda* warnings for a second time. Appellant initialed each of those rights and signed the waiver of rights at the bottom of the form, which included the express statement that he did not want a lawyer at that time. He then gave a statement in which he admitted having been present at the murder scene but denied having done the shooting. This statement ended at approximately 2:15 a.m., at which time Lt. Dozier left the room.

At approximately 2:45 a.m., several officers entered the room and informed appellant that the murder weapon had been located. One officer had the pistol in a brown bag and showed the bag to appellant. According to the officers, appellant said, "Okay, I did it, but it was an accident." Appellant then gave a final statement, which Lt. Dozier wrote down and appellant signed, in which he stated that he pointed the pistol at the victim's head and it went off accidentally.

Appellant's testimony at the suppression hearing differed markedly from that of the officers. He maintained that he told the officers on more than one occasion that he did not wish to speak with them and that he wanted an attorney. Appellant contended that the officers "kept coming back" asking more questions. He admitted signing the second rights statement and waiver at approximately 1:20 a.m. and admitted giving the statement acknowledging his presence but denying complicity in the crime. However, he stated that he did so only in response to repeated questioning by the officers, and then only because he thought that he would be released. He denied giving the final, inculpatory statement altogether. He stated that Lt. Dozier merely wrote

something which he (appellant) signed without reading.

■■ Statements arising from custodial interrogation are presumed to be involuntary. The burden is thus on the State to prove that a defendant knowingly and intelligently waived his privilege against self-incrimination and his right to an attorney, and that he voluntarily made the statement. *Scherrer* v. *State*, 294 Ark. 227, 742 S.W.2d 877 (1988); *Scales* v. *State*, 37 Ark. App. 68, 824 S.W.2d 400 (1992). On appeal from the denial of a motion to suppress, we make an independent review based on the totality of the circumstances, but we will not reverse unless the trial court's ruling is found to be clearly erroneous. *Scales* v. *State, supra.* We defer to the trial court's superior position to determine the issue of the credibility of the witnesses who testify to the circumstances of a defendant's custodial statement. *See Porchia* v. *State*, 306 Ark. 443, 815 S.W.2d 926 (1991); *Scales* v. *State, supra.*

■■ In *Miranda* v. *Arizona*, 384 U.S. 436 (1966), the Supreme Court held that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of a defendant unless it demonstrates that it used the familiar procedural safeguards to secure the privilege against self-incrimination and the right to counsel as set forth in that opinion. Once the warnings have been given, if the individual indicates in any manner that he wishes to remain silent, interrogation must cease. *Id.* The admissibility of statements obtained after the defendant has decided to remain silent depends on whether his "right to cut off questioning" was "scrupulously honored." *Michigan* v. *Moseley*, 423 U.S. 96, 104 (1975).

■■ Additional safeguards are necessary when the accused asks for counsel:

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further *police-initiated* custodial interrogation even if he has been advised of his rights. . . .[A]n accused, . . .having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless* the accused himself initiates

further communication, exchanges, or conversations with the police.

*Edwards* v. *Arizona*, 451 U.S. 477, 484 (1981) (emphasis added) (footnote omitted). In other words, where an accused has invoked his right to counsel, "courts may admit his responses to further questioning only upon finding that he (a) initiated further discussions with police, and (b) knowingly and intelligently waived the right he had invoked." *Smith* v. *Illinois*, 469 U.S. 91, 95 (1984); *see Bussard* v. *State*, 295 Ark. 72, 747 S.W.2d 71 (1988). The Supreme Court recently made it clear that the protection afforded by the *Edwards* rule does not terminate simply upon the accused's consultation with counsel. *Minnick* v. *Mississippi*, 498 U.S. 146 (1990). Rather, "when counsel is requested, interrogation must cease, and *officials* may not *reinitiate* interrogation without counsel present, whether or not the accused has consulted with his attorney." *Id.* at 153 (emphasis added).

Appellant argues that the trial court erred in denying his motion to suppress and maintains that reversal is mandated under the Supreme Court's decisions in *Edwards* and *Minnick*. He notes that he asserted his right to counsel and that he subsequently was interrogated further without counsel present. He contends that the record will not support the trial court's findings that he reinitiated communication with the officers and validly waived his right to counsel after he asserted it.

From our review of the totality of the circumstances, we cannot conclude that the trial court's findings are clearly erroneous. Here, there was evidence that, upon being told that he was going to be held in jail, appellant began asking Lt. Dozier why. When Dozier answered his question by stating that there was probable cause to believe that appellant had killed the victim, appellant stated that he wanted to give his version of what had happened. Dozier quickly informed appellant that appellant could not be questioned and that, in order to speak with the authorities, appellant would have to initiate the communication. Appellant "insist[ed]" upon giving a statement. Dozier readministered the *Miranda* warnings to appellant, including his right to remain silent and his right to an attorney. Appellant indicated his understanding of these rights, initialed each one on

the form, and executed a written waiver of those rights. He then gave a statement accusing someone else of shooting the victim. One-half hour later, officers re-entered the room where appellant was, told him that they had recovered the murder weapon, and showed him a paper bag in which they had placed the gun. He then gave his final pretrial statement, in which he admitted having shot the victim.

We cannot agree with appellant that the officers "reinitiated" further communication with appellant simply by telling him that he was going to be held overnight. The officers had a duty to inform appellant that he was under arrest. *See* Ark. R. Crim. P. 4.4(b). Moreover, words or conduct on the part of the police "normally attendant to arrest and custody" do not constitute "interrogation." *Rhode Island* v. *Innis*, 446 U.S. 291, 301 (1980) (footnotes omitted). Rather, we think that appellant reinitiated communication with the authorities with his questioning of Lt. Dozier as to why he was being held and his insistence upon giving a further statement. *See Oregon* v. *Bradshaw*, 462 U.S. 1039 (1983).

Nor can we agree that appellant's 2:45 a.m. inculpatory statement was inadmissible because he did not initiate the particular conversation or exchange during which it was given. The record supports the trial court's finding that appellant validly waived his previously invoked right to counsel after he initiated the communication leading to the statement given between 1:20 and 2:15 a.m. Appellant never again invoked his right to counsel or indicated a desire to remain silent. Therefore, the officers were not prohibited from initiating contact with or questioning appellant at the time that they confronted him with the weapon, and no *Edwards* violation occurred. *See Henderson* v. *Singletary*, 968 F.2d 1070 (11th Cir. 1992)(*supp. op. on reh'g denied*).

Even were we to find that appellant's statement was inadmissible, its admission was harmless, and we would not reverse. As a general rule, most trial errors, including constitutional ones, do not automatically require reversal of a criminal conviction. *Chapman* v. *California*, 386 U.S. 18 (1967). Rather, if the error is harmless, the conviction will be affirmed despite the error. *Id*. In order to be harmless, a constitutional error must be harmless beyond a reasonable doubt. The test is whether there is a

reasonable possibility that the evidence complained of might have contributed to the conviction. *Id.*; *Fahy* v. *Connecticut*, 375 U.S. 85 (1963); *Vann* v. *State*, 309 Ark. 303, 829 S.W.2d 415 (1992). The Supreme Court has recently held that the erroneous admission of an involuntary confession is subject to a harmless-error analysis. *See Arizona* v. *Fulminante*, 499 U.S. ___, 111 S. Ct. 1246 (1991).

At trial in this case, Wade Lawrence, a friend of appellant, testified that several people were gathered at his house on the night of the murder. At approximately 9:00 p.m., appellant and the victim argued. Appellant left and returned about midnight. Kevin Ryan testified that he, Steve Coleman, Kevin Bloesch, and appellant left Lawrence's in Ryan's car at approximately 1:00 a.m. When they saw the victim walking, appellant had Ryan stop the car and the victim got in. Ryan testified that appellant again argued with the victim and told Ryan to turn down a dirt road, which he did. Appellant "started counting down from ten" and then directed Ryan to stop the car. Appellant and the victim got out and walked to the rear of the car. Appellant came back to the passenger door, said "zero," and then walked back toward the rear of the car. Ryan then heard a gun shot and what he thought was a body hitting the ground. Appellant, who had a pistol, immediately got back into the car and told Ryan to "drive." The group returned to Lawrence's home. This testimony was essentially identical to that of Steve Coleman. It was also corroborated by Kevin Bloesch, except with regard to the events that occurred between picking up the victim and stopping the car on the dirt road, during which time Bloesch, Coleman, and Ryan claimed that Bloesch was asleep.

Lawrence testified that, when the group returned to his home, appellant said, "I fucked up. You'll read about it in the paper tomorrow. I shot Lonnie. . . . I popped him right between the eyes." The State Medical Examiner testified that the cause of the victim's death was a single gunshot wound between the eyes. Houston DuPriest, appellant's cousin, testified that appellant brought a pistol to his home and asked him to keep it. That weapon matched ballistically with the bullet removed from the victim. Michael Perry identified the weapon as one that he sold to appellant two weeks before the killing.

From our review of this record, we are convinced that the evidence of appellant's guilt is so overwhelming as to render any possible error regarding admission of his confession harmless beyond a reasonable doubt.

Affirmed.

JENNINGS, C.J., and MAYFIELD, J., agree.