# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT JACKSON

### DECEMBER SESSION, 1998

FILED

April 23, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | C.C.A. NO. 02C01-9710-CR-00394 |
| | ) | |
| Appellee, | ) | |
| | ) | SHELBY COUNTY |
| V. | ) | |
| | ) | |
| | ) | HON. W. FRED AXLEY, JUDGE |
| BERNARD T. ANDERSON, | ) | |
| | ) | |
| Appellant. | ) | (FIRST DEGREE MURDER) |

FOR THE APPELLANT:                    FOR THE APPELLEE:

**LEE WILSON**
200 Jefferson Avenue, Ste. 800
Memphis, TN  38103

**JOHN KNOX WALKUP**
Attorney General & Reporter

**DOUGLAS D. HIMES**
Assistant Attorney General
2nd Floor, Cordell Hull Building
425 Fifth Avenue North
Nashville, TN  37243

**JOHN W. PIEROTTI**
District Attorney General

**EDGAR PETERSON, IV**
Assistant District Attorney General
Criminal Justice Center, Suite 301
201 Poplar Avenue
Memphis, TN  38103

OPINION FILED _____

REVERSED AND REMANDED

THOMAS T. WOODALL, JUDGE

# OPINION

The Defendant, Bernard T. Anderson, appeals as of right from his conviction for first degree murder in the Shelby County Criminal Court. Following the sentencing phase of the trial, the jury sentenced the Defendant to life imprisonment without the possibility of parole. Defendant asserts the following issues on appeal:

I.  Whether the trial court erred by denying Defendant's motion to suppress and allowing Defendant's statements to the police to be admitted into evidence;

II.  Whether the trial court properly admitted Defendant's prior conviction for theft;

III.  Whether the trial court properly admitted certain photographs which Defendant alleges were more prejudicial than probative;

IV.  Whether the evidence was sufficient to convict Defendant of first degree murder;

V.  Whether the evidence was sufficient to impose life imprisonment without the possibility of parole based upon the aggravating circumstance that the murder was committed during the commission of a robbery; and

VI.  Whether the trial court erred in admitting evidence of "other crimes" through Defendant's statements to the police.

Based upon the erroneous admission of Defendant's statement of January 11, 1995, to the police, we reverse the Defendant's conviction and remand for a new trial.

A pretrial hearing was held on September 14, 1995, to determine whether three (3) statements, taken on October 10, 1994, January 9, 1995, and January 11, 1995, should be suppressed pursuant to Defendant's pretrial motion. Otis Stewart, the chief investigating officer in the Homicide Division, was assigned to the murder of Gregory Harris. Information given to the police pointed to the Defendant as having a prior altercation with the victim. On October 10, 1994, Defendant appeared

at the police station to provide a witness statement. Defendant was accompanied by an attorney, Forrest Durand, who had not as yet been retained to represent Defendant. Defendant was not given his Miranda rights prior to giving his statement as Stewart explained that he was not a suspect at that time. Defendant gave a nine (9) page statement in which he denied any involvement or knowledge regarding the murder of the victim. Defendant instead related that the last time he had spoken with the victim was on September 24, 1994, three (3) days prior to his murder on September 27, 1994. Durand was present during the entire time in which Defendant gave his statement, and Defendant and Durand left after the Defendant completed his statement.

Stewart received further information that Defendant was involved in the murder of the victim and asked him to come in for questioning in January 1995. On January 9, 1995, Defendant and Durand again appeared at the police station for an interview. Defendant was advised of his constitutional rights and then initialed a written waiver of his rights at 3:30 p.m. After conferring with Durand, Defendant gave an oral statement. At 5:20 p.m., the Defendant was again advised of his rights and then signed a written waiver of his rights. Stewart recalled that Durand was "in and out" during the course of the interview.

In this five (5) page statement given to police on January 9, 1995, Defendant admitted that he was involved in the murder of the victim. On September 27, 1994, Defendant beeped the victim, knowing that Robma Williamson intended to kill the victim. Defendant was living with Williamson and Williamson's family at the time. Defendant arranged for the victim to give them a ride. After being picked up by the victim outside of Williamson's home, the three (3) drove to a rural area of Shelby

County where Williamson shot the victim twice. At the conclusion of his statement, Defendant was taken into police custody.

On January 11, 1995, Stewart got Defendant out of his jail cell at 1:30 p.m. in order to clarify some things regarding his prior statement. Stewart recalled that Defendant was allowed to telephone his father, Darrell Anderson, at 1:35 p.m. Defendant was again advised of his rights and signed a written waiver. Stewart stated that Defendant did not ask for his attorney, nor did Stewart attempt to contact Durand. In this final and third statement to the police, Defendant stated that he actually shot the victim based upon the victim's disrespect toward him.

Defendant also testified at the hearing. He recalled that on October 10, 1994, Durand accompanied him to the police station and the police advised him of his rights. On January 9, 1995, Durand again accompanied Defendant to the police station. During the course of the interview with the police, Durand left for a period of twenty-five (25) minutes. Although the police did call Durand as requested by Defendant during Durand's absence, he claimed the police continued to question him. Both Defendant and Durand were given the opportunity to read the statement prior to Defendant signing it. Defendant stated this statement was given freely and voluntarily.

On January 11, 1995, Stewart retrieved Defendant from his jail cell in order to "clear up" his previous statement. Defendant testified that he requested the presence of his attorney on three (3) occasions, but that Stewart refused each request. Defendant also did not recall being advised of his rights, although he did sign a "telephone waiver" (form which documents Defendant's request for a

telephone call), prior to his statement even though he did not call his father until the statement had been completed. Defendant stated that he gave this third statement because he "was scared of what my charge partner might do to [him] or what the officers probably would want to do to [him]." Defendant did read the statement before he signed it.

Forrest Durand testified that on October 10, 1994, he was only assisting Defendant at Defendant's brother's request. Defendant was only interviewed as a witness that day, but Durand was certain that he was not present when the statement was typed up. On January 9, 1995, Durand represented Defendant, although he had not as yet been paid a retainer fee. After being present during a portion of the interview, Durand left with the impression that the police were through and were drawing up charges. Durand returned to his office, but at approximately 4:15 p.m. he received notice that Defendant was giving a statement. Durand recalled that he was "stunned and shocked" when he received the message. Durand returned immediately to the police station, although he believed that some statements were given before his return. Durand was present at the conclusion of the statement, following which he and Defendant signed the statement. Durand was not notified or even aware of the third statement given by the Defendant on January 11, 1995.

In its ruling on the motion to suppress, the trial court found that on January 9, 1995, Defendant came to the police station with his attorney at approximately 3:00 p.m. Specifically, the trial court made the following findings:

> After discussion with the police and [Defendant], [Defendant's attorney] left the police department. Anderson was advised of his rights at 3:30 that afternoon and initialed an acknowledgment form which described those rights. **Anderson requested a second conference with Mr. Durand before answering any questions or making a statement.**

> Mr. Durand was called and returned to the police department. At 5:10 p.m. Anderson was again advised of his rights and signed the advice of rights and waiver of rights forms used by the Memphis Police Department. At 5:23 p.m. Anderson was told that he was under arrest, that he might be charged with first degree murder, and, after he acknowledged understanding the rights which were again explained to him, Anderson began to give his second statement. Anderson admitted calling Gregory Harris with full knowledge that he was to be murdered and accused Robma Williamson of shooting the victim. The statement ended with the following:
>
> Q: Is your attorney, Forest Durrand, present during this statement?
> A: Yes sir.
> Q: Is this statement given freely and truthfully, without any threats or promises?
> A: Yes sir.
> Q: I will ask you to read over this five page statement, and if you find it to be true and correct given by you, I will ask you to initial the bottom right hand corner of the first four pages and sign your name, date and time on the lines provided below. Do you understand?
> A: Yes sir.
>
> (Emphasis added).

The trial court further noted that the Defendant initialed each page of the statement and signed it at 6:16 p.m. on January 9, 1995. Defendant's attorney also signed the statement as a witness.

At trial, the State began its evidence with the testimony of Robert Harris. Harris, the victim's father, testified that in September 1994, the victim was living at home with his parents and working for Federal Express. On September 27, 1994, the victim left his home to go to work and Harris never saw the victim alive again. Police officers came to their home early in the morning hours of September 28, 1994, to notify the family of the victim's death. Harris went to the morgue and identified his son. Harris recovered his son's personal property from the police, including lighters, a small knife, a comb, a compact, a tube of chap-stick, a beeper, two (2) rings, and one (1) penny.

Patricia Harris, the victim's mother, testified that her son and the Defendant had known each other since elementary school. On September 24, 1994, prior to leaving for work, Mrs. Harris gave the victim approximately $10.00 when he asked her if she had any money. Because she had a headache, she laid down in her bedroom. When she arose, her son and Erby Pritchard were there. Around 5:45 p.m., the victim came into her bedroom and asked what they were going to eat for dinner. After replying that she did not feel well because of her headache, she told him she would not be cooking. This was the last time she saw the victim alive.

On September 28, 1994, at approximately 2:00 a.m., a police officer arrived at her home and they advised her of the victim's death. The Defendant telephoned her home and asked what he could do for their family due to the victim's death. Mrs. Harris estimated that the Defendant called two (2) or three (3) times that day. She explained on cross-examination that the Defendant had been barred from their home and she could not say that the victim and the Defendant were friends at the time of the victim's death.

Dr. Thomas Francisco is the medical examiner for Shelby County, and he performed the autopsy of the victim on September 29, 1994. His examination revealed that there were two (2) gunshot wounds to the head that were "near-gunshot wounds," meaning that the powder was deposited on the skin itself. As the range of fire was found to be "loose contact," he stated that the muzzle was not tight against the head but was close enough that the soot and powder and stipling were deposited on the skin adjacent to the area. Dr. Francisco described that with loose contact gunshots, the muzzle of the gun was probably touching the body upon firing. Dr. Francisco described the damage to the victim's brain as the skull being fractured,

with a tearing of the brain stem itself, resulting in almost instantaneous death. Both wounds were fatal, allowing less than a minute for the victim to die as a result of the gunshots.

Erby Pritchard testified that he was friends with the victim. On September 27, 1994, the victim came to Pritchard's home, driving his turquoise Mazda Protégé, and they rode around the neighborhood for a while. After going to the victim's home, the two (2) left again in the victim's Protégé and drove over to the Fellow Homes area in search of marijuana. Pritchard purchased a "dime sack" of marijuana for $10.00 and they rolled up a joint and then shared it. The victim stopped by Captain D's and purchased a fish sandwich, then told Pritchard that he had to go take care of some business and would drop him off. Prior to leaving his home, the victim had received a page from "Bernard." When Pritchard asked if he could go along with the victim, the victim indicated that he had some business with "Nard" that he was going to take care of by himself. Later that evening, Pritchard stated that he called the victim's home and paged him to find out if he had returned and never received a response.

Roberta Wilkins lives at 1774 West Raines and was seventy-five (75) years old at the time of the trial. She lived by herself in her home which is near the intersection of Raines and Sewanee. On September 27, 1994, she called her son and asked for him to come and take her to the grocery store. An hour later, she heard a "rumbling" noise outside. Mrs. Wilkins got up and looked out her front door, towards the corner of Raines and Sewanee. She estimated the time to be approximately 7:30 or 8:00 p.m. She could see the top of a little car and saw one (1) person moving around the car who looked to be a black male. Mrs. Wilkins saw the figure walk across the road, come back to the car and get in and then drive up

Sewanee Road. When her son arrived, they drove to Kroger and she told him what had happened. On their way home, they stopped at the intersection of Raines and Sewanee. Her son got out of the car because he had observed what first appeared to be a "paper or box" on the side of the road. The police drove through the area and her son asked them to stop because he thought he had found a body. Mrs. Wilkins did not look in the area of where the body was found.

Willie Wilkins, Mrs. Wilkins' son, testified that on September 27, 1994, he took his mother to the grocery store. On their way home, they stopped at the intersection of Raines and Sewanee because he saw "something like some eyes shining." When Mr. Wilkins got a little closer, he observed a pack of dogs and then saw a body lying there. Wilkins sat in his car until a police officer drove by and then advised him that there was a body lying in the grass.

Bobby Jones, an officer with the Memphis Police Department, was on duty on September 27, 1994. He was called to the intersection of Raines and Sewanee at approximately 11:30 p.m. When he arrived, he saw a body lying on the north side of the road. Jones could not at first identify if the body was that of a male or female as there was a jacket around the head and the victim's shirt was partially pulled up to the rib cage. There were no signs of life and the body was actually stiff. Jones secured the scene while waiting for officers to arrive and assist him. He recalled that the victim had two (2) rings on his left hand.

C.B. Hatchel, assigned to the criminal crime scene bureau of the Memphis Police Department, recounted his investigation of the scene on September 27 and 28, 1994 at the intersection at Raines and Sewanee. He observed the victim's body

in a grassy area to the northwest. He took photographs and drew sketches of the body. A comb, some chap-stick, one (1) penny and a beeper were found scattered about in the grass near the victim's shoulder. A powdered compact was found in the victim's right rear pocket. From the photographs he took, Hatchel identified a picture of the victim in which his pants pockets are turned inside out. The photographs also demonstrated that the victim's coat was pulled up over his head.

Sergeant Otis Stewart of the Memphis Police Department works in the Homicide Bureau and was working there on September 28, 1994, when he was assigned to this case. After talking with Erby Pritchard, Stewart began to investigate the Defendant as a possible witness. The police contacted the Defendant and asked him to come in as a possible witness. The Defendant came to the police station on October 10, 1994, accompanied by an attorney, Forrest Durand. Defendant's October 10, 1949 statement was read to the jury.

While continuing their investigation, the department received more information linking the Defendant and Robma Williamson to the victim's death. The Defendant was again requested to come to the police station on January 9, 1995, and he again showed up with his attorney Forrest Durand. Because Defendant was now a potential suspect, he was advised of his rights prior to his interview. Defendant read and executed the waiver of rights form in his attorney's presence. Sergeant Stewart described that Attorney Durand was "there partially through most of the oral interview." He read this second statement to the jury. Sergeant Stewart recalled that Forrest Durand came back into the interview room just as Defendant was reading over his statement and preparing to sign it. Durand witnessed the signing of the statement, then the Defendant was arrested.

-10-

On January 11, 1995, the Defendant was again advised of his Miranda rights and brought in for questioning. Prior to the questioning, Defendant signed a "telephone waiver" and called his father, Darrell Anderson, at 1:35 p.m. At 1:40 p.m., the Defendant signed an "Advice of Rights" form which acknowledged that he had been advised and had waived his rights. Sergeant Stewart noted that Defendant's lawyer was not present and that Defendant did not request his attorney's presence at any time during the questioning. As described above, the contents of such statement was read into evidence for the jury.

This was the close of the State's case-in-chief.

The Defendant testified on his own behalf. Defendant described his relationship with the victim as "best friends," seeing each other nearly every day of the week. Defendant denied killing the victim, stating that Robma Williamson actually killed him. Defendant also denied any knowledge of luring the victim to the car so that Robma Williamson could commit murder. He indicated that any statements which indicated he did have knowledge of Williamson's intent had been added into his statements without his knowledge. He had been in jail for approximately sixty-four (64) hours when the police came in to retrieve him for questioning on January 11, 1995. Sergeant Stewart took him from his cell without telling him anything and accompanied him to a conference room where another man was waiting. Once inside the conference room, Stewart advised him that he was there "to clear up a few matters in the statements that [he] gave in [his] previous statements on the 9th of January." Defendant again stated that he was not advised of his rights prior to giving a statement on January 11, 1995. It was only after giving his statement that Defendant recalled being given the "Advice of Rights" form which

-11-

he signed. Prior to giving his statement, Defendant asked for his attorney on three (3) separate occasions, but was denied that right each time.

Defendant stated that he paged the victim to ask him for a ride to a friend's house. The victim agreed and, after going to Defendant's friend's home, Robma Williamson left with them. Defendant recalled that when the victim stopped at the intersection of Raines and Sewanee, Williamson suddenly shot the victim in the head. Defendant stated he had no idea of Williamson's intentions to kill the victim and that Williamson later threatened to kill Defendant if he told anyone.

On cross-examination, Defendant admitted to many inconsistencies within his statements. He did admit to a prior conviction of theft on January 26, 1993 to which he pled guilty.

## I. SUPPRESSION OF STATEMENTS

The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. Id. at 23. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise. Id. In evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, the appellate court may consider the proof adduced both at the suppression hearing and at trial. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

Following the suppression hearing, counsel for the Defendant conceded that Defendant admitted that as to the second statement, it was a freely given statement. The trial court then denied the remainder of Defendant's motion to suppress by written order on November 8, 1995. The trial court found that the statement of October 10, 1994, was taken when Defendant was not a suspect nor was he in custody. The trial court also held as to the January 11, 1995 statement, that "[t]here is ample evidence that the Defendant knowingly, intelligently, and voluntarily chose not to exercise his rights on the occasion of his third statement. The police were not obligated to contact his attorney under these circumstances."

However, the State has since conceded in both its brief and at oral arguments before this court that under the authority of Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) and Minnick v. Mississippi, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), the Defendant was deprived of his rights while giving his third statement of January 11, 1995, pursuant to the Fifth and Fourteenth Amendments of the United States Constitution.

### A. STATEMENT OF OCTOBER 10, 1994

The Defendant does not make an argument in his brief regarding the trial court's refusal to suppress the first statement of October 10, 1994. In Miranda v. Arizona, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination requires police officers, before initiating questioning, to advise the putative defendant of his right to remain silent and his right to counsel. Specifically, Miranda requires police to inform the person being

questioned that (a) he has the right to remain silent; (b) any statement made may be used as evidence against him; (c) he has the right to the presence of an attorney; and (d) if he cannot afford an attorney, one will be appointed for him prior to questioning, if he so desires.  384 U.S. at 444, 86 S.Ct. at 1612.

However, an officer's obligation to administer <u>Miranda</u> warnings only attaches "where there has been such a restriction on a person's freedom as to render him 'in custody.'"  <u>Stansbury v. California</u>, 511 U.S. 318, 322, 114 S.Ct. 1526, 1528, 128 L.Ed.2d 293 (1994) (<i>citing</i> <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977)).  "Custodial interrogation" refers to "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  <u>Miranda</u>, 384 U.S. at 444, 86 S.Ct. at 1612.  In the case <u>sub judice</u>, Defendant came to the police station of his own free will after being requested by the police to answer some questions regarding his personal relationship with the victim.  Immediately after giving a statement, Defendant left the police station.  Even if Defendant did contest this statement's admission into evidence, the law in Tennessee is such that no <u>Miranda</u> warning is required during the initial investigation by police where the witness is neither a prime suspect nor in custody.  <u>State v. Underwood</u>, 669 S.W.2d 700, 703-04 (Tenn. Crim. App. 1984).

B.  STATEMENT OF JANUARY 9, 1995

Defendant argues his second statement of January 9, 1995, to the police was erroneously admitted into evidence by the trial court and should have been suppressed.  Defendant contends that counsel was not present during the entire

course of questioning and, therefore, any statement taken was in clear violation of Miranda v. Arizona, 384 U.S. at 436, 86 S.Ct. at 1602, and Edwards v. Arizona, 451 U.S. at 477, 101 S.Ct. at 1880. It is significant that following the hearing on the motion to suppress, counsel for Defendant did not argue that the second statement should be suppressed as Defendant had "already said that was a freely given statement on the record." Therefore, the trial court did not make a specific conclusion on this second statement, although it did make factual findings. In addition to arguing the issue has been waived by the Defendant, the State argues that such statement was given freely and voluntarily by the Defendant, in full understanding of his rights.

The voluntariness test under the Tennessee Constitution is more protective of individual rights than the test under the United States Constitution. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). To effectively waive his rights, defendant must have personal awareness of both the nature of the right and the consequences of abandoning his rights. See Stephenson, 878 S.W.2d at 544-45. Additionally, his statements cannot be the result of intimidation, coercion or deception. Id.

First, we note that the Defendant has waived this issue by submitting to the trial court that such statement was voluntary following the hearing on the motion to suppress. See Tenn. R. App. P. 36(a). Defendant himself stated that his statement was freely and voluntarily given and was made in the presence of his attorney. Testimony from his attorney demonstrated that he was present when the statement was taken and signed the statement as a witness. In any event, pursuant to the evidence presented documenting that Defendant was both presented with and

waived his <u>Miranda</u> rights, we cannot conclude that the second statement given by the Defendant should have been suppressed. The greater weight of the evidence supports the trial court's findings that Defendant was read and then signed an acknowledgment of rights form prior to giving his statement. Furthermore, Defendant's attorney was called when Defendant requested prior to the taking of that same statement. Both the evidence at the hearing on the motion to suppress and at trial demonstrate that the preponderance of the evidence does not fall in the Defendant's favor for suppression. This issue is without merit.

C.  STATEMENT OF JANUARY 11, 1995

Finally, Defendant contends that his third statement made to the police on January 11, 1995, was taken and admitted into evidence in violation of <u>Edwards v. Arizona</u>, 451 U.S. at 477, 101 S.Ct. at 1880, and <u>Minnick v. Mississippi</u>, 498 U.S. at 146, 111 S.Ct. at 486. In <u>Minnick v. Mississippi</u>, our Supreme Court held that a fair reading of <u>Edwards v. Arizona</u> and subsequent cases demonstrate that "we have interpreted the rule to bar police-initiated interrogation unless the accused has counsel with him at the time of questioning." <u>Minnick</u>, 498 U.S. at 153, 111 S.Ct. at 491. When counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney. <u>Id</u>. The State conceded both in its brief and at oral argument before this court that <u>Minnick</u> controls this case and that Defendant was deprived of his rights under the Fifth and Fourteenth Amendments of the United States Constitution regarding the third statement on January 11, 1995. While there is some contradiction in the testimony of various witnesses as to whether Defendant requested counsel on January 11, 1995, any inconsistencies are irrelevant.

Defendant invoked his right to counsel on January 9, 1995, and the police were, therefore, prohibited from reinitiating their interrogation of him without counsel present on January 11, 1995. Minnick, 498 U.S. at 153.

Although reversal of this conviction is required on the suppression issue, we will also address the other issues raised by the Defendant. The State, conceding the trial court's error in denying the Defendant's motion to suppress his third statement to the police, filed a motion to reverse the trial court's judgment and remand this case for a new trial prior to filing its brief with this court. Our court, however, denied the motion finding that "this and other issues raised by the [Defendant] in his brief should receive thorough consideration on appeal, as they may resurface upon remand."

## II. ADMISSION OF PRIOR THEFT CONVICTION

Defendant argues that the trial court erred in allowing the State to question him regarding his prior theft conviction. While the State agrees that the theft conviction was not relevant to the murder of the victim, it contends it was certainly relevant to the issue of the Defendant's credibility.

Tennessee Rule of Evidence 609(a)(3) allows the State to impeach an accused if prior notice has been given and if the probative value of the conviction outweighs its unfair prejudicial effect on substantive issues. Subdivision (a)(2) of Rule 609 further states that the crime must either be a felony or must have involved "dishonesty or false statement." It has long been established that theft crimes involve dishonesty. See State v. Butler, 626 S.W.2d 6, 11 (Tenn. 1981).

Furthermore, the offense of theft is "highly probative" of credibility. State v. Baker, 956 S.W.2d 8, 15 (Tenn. Crim. App. 1997) (citations omitted). The State followed procedural rules, giving notice to the Defendant of its intent to impeach him with the theft conviction. Any prejudicial effect was outweighed by the probative value of this theft conviction upon the issue of Defendant's credibility. This issue is without merit.

### III. ADMISSION OF PHOTOGRAPHS

Defendant contends that the trial court erred in admitting certain photographs of the victim. Specifically, Defendant objects to the admission of Exhibits 19, 20, 21, 22 and 23. In determining the admissibility of photographs, the court must first determine that the evidence is relevant to the issues at trial and then decide whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. State v. Banks, 564 S.W.2d 947, 949-51 (Tenn. 1978); Tenn. R. Evid. 402, 403. The admissibility of photographs falls within the sound discretion of the trial court, and this court will not interfere with the trial court's exercise of discretion absent a clear abuse of that discretion. State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993); Banks, 564 S.W.2d at 949.

We first observe that the State correctly points out within its brief that counsel for the Defendant specifically agreed with the admission of Exhibits 19 and 20. Therefore, this issue is waived as to the admission of these photographs. See Tenn. R. App. P. 36(a); Teague v. State, 772 S.W.2d 915, 926 (Tenn. Crim. App. 1988); perm. to appeal denied, id. (Tenn. 1989); State v. Killebrew, 760 S.W.2d 228, 235 (Tenn. Crim. App.), perm. to appeal denied, id. (Tenn. 1988). However, as to Exhibits 21, 22 and 23, the Defendant did object.

Exhibit 21 depicts the crime scene, showing that the victim's pants pocket is turned inside out as if he had been robbed. This certainly was probative as to the State's proof to demonstrate that the Defendant killed and robbed the victim. Exhibit 22 is a closeup of the crime scene itself, only showing a portion of the victim's body. However, the closeup photograph does depict the pants pocket of the victim being turned inside out and that the victim's shirt and jacket had been pulled over his head as according to testimony of the officers on the scene. Finally, Exhibit 23 is simply a photograph from a different angle of the upper portion of the victim's body. It shows the victim's exposed midriff, with his shirt and jacket pulled over his head.

Exhibits 21 and 22 are probative to the State's case-in-chief. Both depict the crime scene and various personal items of the victim which were identified by his family. Also, the scene depicts the pants pocket being turned inside out to support the State's theory of robbery and the shirt and jacket pulled over his head which was testified to by the Defendant in his second statement. The trial court was correct in ruling that the probative value of these photographs outweighs any potential for unfair prejudice. The relevancy of Exhibit 23 is questionable, in light of the fact that other photographs depict the same scene from a different angle. However, we note that none of these photographs depict a gruesome scene as the wounds to the victim are covered by his shirt and jacket, and only blood is visible. Therefore, there was no prejudice in the admission of Exhibit 23. This issue is without merit.

IV. SUFFICIENCY OF THE EVIDENCE

Defendant argues that the evidence was insufficient to support a guilty verdict for first degree murder. At the time of this offense, first degree murder was an "intentional, premeditated and deliberate killing of another." Tenn. Code Ann. § 39-13-202 (Repealed 1995). A deliberate act is "one performed with a cool purpose." Tenn. Code Ann. § 39-13-201(b)(1) (Repealed 1995). A premeditated act is "one done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-201(b)(2) (Repealed 1995).

When an accused challenges the sufficiency of the convicting evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this court. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App.), perm. to appeal denied, id. (Tenn. 1987). Nor may this court reweigh or reevaluate the evidence. Cabbage, 571 S.W.2d at 835. A jury verdict

approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. Grace, 493 S.W.2d at 476.

The victim was shot twice in the head, with medical evidence demonstrating that either shot was fatal. In his statements to the police of January 9 and January 11, 1995, the Defendant admitted luring the victim to pick him up and then driving him to a remote area so that the victim could be killed. In his statement of January 11, 1995, the Defendant admitted to shooting and killing the victim, both with premeditation and deliberation. The Defendant stated that he "was under a lot of stress and [he felt] that all [he had] done for him, [the victim] should have owed [Defendant] something." When asked if he paged the victim on September 27, 1994, at approximately 5:15 p.m., with the knowledge that the victim would be lured to the Boxtown area and had the intention of killing him, the Defendant responded affirmatively. In the light most favorable to the State, this evidence was sufficient where by a rational trier of fact could have concluded beyond a reasonable doubt that Defendant intentionally killed the victim with both premeditation and deliberation.

We note that all evidence admitted at the trial, even if admitted erroneously, can be considered when addressing a defendant's challenge to the sufficiency of the evidence to sustain the conviction. See Lockhart v. Nelson, 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988); State v. Longstreet, 619 S.W.2d 97, 100-01 (Tenn. 1981).

V. SUFFICIENCY OF EVIDENCE TO SUPPORT AGGRAVATING CIRCUMSTANCE

Defendant argues that the evidence was insufficient to support the aggravating circumstance of murder during the perpetration of a robbery. In order to impose a sentence of life without parole, the jury has to find that the State proved beyond a reasonable doubt one of the aggravating factors found in Tennessee Code Annotated section 39-13-204(i). In the Defendant's second statement of January 9, 1995, he admitted that the victim was robbed. The victim's mother testified that she had given the victim $10.00 earlier that day. The photographs depicted the victim's personal items strewn around his body and his pants pocket turned inside out. Based upon this evidence and Defendant's own admission, the jury reasonably determined that the murder was committed while the Defendant had a substantial role in committing a robbery. This issue is without merit.

VI. ADMISSION OF EVIDENCE OF OTHER CRIMES

Defendant contends that the State was erroneously allowed to introduce proof of other crimes by virtue of his statements to the police. Rule 404(b) of the Tennessee Rules of Evidence states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes." The "other crimes" to which Defendant is referring were included in his statements to the police in which Defendant indicated there was a warrant for his arrest for cashing one of the victim's checks and that he had been involved in a robbery. Specifically, the statement referring to cashing the victim's check was as follows:

Question:  Why would Mr. Durand come with you today?

Answer: My brother's request. He had found out that I had supposedly cashed one of Gregory's checks, and they a [sic] warrant for my arrest for the check.

Question: Have you cashed a check belonging to Gregory Harris?

Answer: No, sir.

Question: Is there any other reason that you brought an attorney with you today?

Answer: My brother recommended me to the attorney. My brother contacted the attorney about the check. Then I told him about the talk in the street that I had killed Gregory.

The other two statements to which Defendant refers include his admission that he paged the victim to ask for a ride to someone's home to pick up money from a robbery.

For each objection the Defendant raised, the trial court complied with the requirements of Rule 404(b). The court held a hearing outside the presence of the jury in which it determined the material issues and then determined that such evidence need not be excluded according to the provisions of Rule 404(b)(1),(2) and (3). Rule 404(b) allows such evidence of "other crimes" to be admitted when it is relevant to a litigated issue, such as identity, intent, or rebuttal of accident or mistake, and its probative value is not outweighed by the danger of unfair prejudice. See State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985); State v. Hooten, 735 S.W.2d 823, 824 (Tenn. Crim. App. 1987).

Although any statement the Defendant made regarding a warrant for his arrest for cashing one of the victim's checks was not relevant according to Rule 404(b), neither was it unfairly prejudicial. There was never any corroborating evidence of

this warrant, and the Defendant himself immediately denied cashing the victim's check. Pursuant to Rule 103(a) of the Tennessee Rules of Evidence, the admission or exclusion of evidence is not a basis for error unless the ruling affects a substantial right of the accused. We find that even if the trial court did err in refusing to redact the portion of the Defendant's statement referring to this warrant, no substantial right of the Defendant was affected thereby. In light of the convincing evidence of Defendant's guilt, any error in the admission of this evidence was harmless. See State v. Shelley, 628 S.W.2d 436, 438 (Tenn. Crim. App. 1981); Tenn. R. App. P. 36(b).

The remaining portions of Defendant's statement to which Defendant objects as admitted in error were, in fact, admissible as relevant to the issue of intent. The Defendant stated that, "I had him [victim] come to take me to pick up some money from a robbery." When asked if he beeped the victim knowing that he would lure him to a remote area with the intention of killing him, the Defendant admitted that this was his intent. Clearly, this evidence went directly to the State's theory that the Defendant, with premeditation and deliberation, paged the victim to pick him up and then directed him to drive to a remote area where he shot and killed the victim. This issue is without merit.

CONCLUSION

Defendant's third statement on January 11, 1995, was admitted in error at trial. The statement of January 11, 1995 is suppressed and is inadmissible at

-24-

Defendant's new trial. Defendant's conviction is reversed, and this case is remanded to the trial court for a new trial.

_____
THOMAS T. WOODALL, Judge


CONCUR:


_____
GARY R. WADE, Presiding Judge


_____
JOHN EVERETT WILLIAMS, Judge