927 So.2d 629 (2006)
STATE of Louisiana, Appellee,
v.
Owen Hugh ROBERTSON, Appellant.
No. 40,626-KA.
Court of Appeal of Louisiana, Second Circuit.
April 12, 2006.
*631 Louisiana Appellate Project by Prentice L. White, New Orleans, Rickey Kenard Swift, for Appellant.
Paul Joseph Carmouche, District Attorney, Catherine Marion Estopinal, Edward M. Brossette, Assistant District Attorneys, for Appellee.
Before WILLIAMS, PEATROSS and DREW, JJ.
DREW, J.
Owen Hugh Robertson was convicted at bench trial of the crime of manslaughter. He was adjudicated as a fourth felony habitual offender and sentenced to 40 years' imprisonment at hard labor, without benefit of probation, parole[1] or suspension of sentence. The defendant now appeals. We affirm.

FACTS
On the morning of January 14, 2002, Debra Fay ("Debbie") Robertson left the trailer home she shared with her husband, defendant herein, and drove her children to catch their school bus. Her vehicle being inoperable, she was driving a borrowed truck belonging to her father-in-law, Jimmy Robertson, who lived next door. On the way to the bus stop, Debbie saw her husband's truck parked at the home of a neighbor. Debbie suspected her husband of having an affair with this woman. After dropping off the kids, Debbie then drove back to confront her husband. Following an ugly scene, she left, being followed by the defendant.
At about 8:00 a.m. Jimmy heard his truck enter his property and then heard his son's truck arrive shortly thereafter. At trial, Jimmy opined that Debbie had just enough time to walk from his residence back to hers when he heard a shot. At his son's request, Jimmy dialed 911.
Cumulative testimony from investigating personnel from the Caddo Parish Sheriff's Office and from the coroner was as follows:
 Caddo deputies arrived within minutes of receiving the call and determined that Debbie had been shot and killed.
 While Corporal Ernest French handcuffed the defendant for officer safety, the defendant told him that Debbie "shot herself."
 In his initial statement at the crime scene to Det. Stacy Cowgill, the defendant stated that Debbie was walking up the steps to the house when the gun fell out of her purse, struck the steps or a rock, went off and killed her.
 He was inside the house when he heard the gunshot and didn't see what happened.
 The investigating officers found an apparently staged crime scene.

*632  The body was found lying inside the doorway on her back with her feet toward the stairway leading to the porch.
 The only blood found nearby was underneath Debbie's body, which had one bullet wound.
 The bullet entered her right upper back just above the level of the top of the right armpit and upper arm, traveled through her body from right to left, slightly downward (by 2½ to 3 inches) and back to front, and exited behind her left armpit through the upper part of her left arm, penetrating both lungs and her aorta, causing her to bleed to death.
 The path of the bullet through her body made it physically impossible for her to have been shot by a gun which had fallen on the ground.
 The bullet path through her body was inconsistent with a self-inflicted gunshot, but was consistent with her having been shot by a taller person.
 The decedent was 5' 7" tall.
 The defendant is 6' 4" tall.
 The officers found a Ruger Super Blackhawk .44 magnum pistol under Debbie's purse, on the right side of the base of the steps, resting barrel-up against a hardened bag of Sacrete.[2]
 The marks on the Sacrete and the gun were inconsistent with markings sustained from a simple short fall.
 In front of the house (about 19 feet away from the body) was a red bench where investigators discovered her glasses.
 There was blood spatter on the bench, on the ground and on several pairs of hunting boots located on the bench.
 A screen/storm door covered the ground where Debbie's blood was discovered, but there was no blood on the door, appearing to investigators that the door had been placed over the blood to hide it.
 On the ground behind the bench area was an EZ Mart Styrofoam coffee cup containing coffee.
 The investigators concluded that the defendant intentionally shot Debbie while she was near the bench.
 Neither the gun nor the coffee cup yielded any usable prints.
Police officers conducted three interviews with the defendant, the last two being recorded. In all three statements, the defendant indicated that the shooting was accidental.
The defendant's first statement was taken at the crime scene by Det. Cowgill in the presence of Deputy Janet Sowell after the defendant was advised of and waived his Miranda rights. As related herein above, the defendant told Det. Cowgill that Debbie was walking up the steps to the house when the gun fell out of her purse, struck the steps or a rock, went off and killed her.
On January 14, 2002, the defendant gave a second (and first recorded) statement to Deputy Kay Ward at the detectives' office. Det. Jay Long was also present. Prior to the statement, the defendant was advised of and waived his Miranda rights and signed a waiver of rights form. No threats, inducements or promises were made to obtain the statement, and the defendant was not under the influence of any fear, duress or intimidation. The defendant did not appear to be under the influence of any drugs or intoxicants and appeared to understand his rights and to have voluntarily waived those rights. Although *633 the defendant said he had taken some methamphetamine or pills the night before the interview, he did not say anything about being on drugs during the interview.
The substance of this statement was very similar to what he told Det. Cowgill at the crime scene in the initial statement. He explained that he had seen the gun "laid (sic) in the purse" as Debbie walked to their residence over from his father's house (referring to Jimmy Robertson). The defendant related that he had entered the kitchen of their home and as Debbie entered the house after him, the gun fell out of her purse, struck the ground and went off. The defendant said he heard the gunshot and ran outside. Debbie had apparently backed down the steps and he saw her collapse. He related that he ran over to pick her up. During the process of picking her up, the defendant fell over a bench. Then he carried her to the porch and tried to resuscitate her. The defendant stated that he ran over to his father's house and told him to dial 911 because Debbie had been shot.
As this statement progressed and investigators asked the defendant how the door ended up on top of the blood near the bench (where Debbie was apparently shot), the defendant added that he tripped over the bench AND the door, which was right beside the truck. He explained that the nails in the door got hung up on his coat "or something," when he got up with her. The defendant further explained that the dog also got under his feet. He speculated that the dog tripped Debbie, causing her to fall backwards off the steps.
The defendant's third (and second recorded ) statement was taken by Det. Cowgill in the presence of Deputy Sheila Hostnick at the Caddo Correctional Center on January 16, 2002. Before the statement was taken, the defendant was advised of and waived his Miranda rights and signed a waiver of rights form. No threats, inducements or promises were made to obtain the statement, and the defendant was not under the influence of any fear, duress or intimidation. The defendant did not appear to be under the influence of any drugs or intoxicants and appeared to understand his rights and to have voluntarily waived those rights.
In this statement, the defendant changed his story  he said that he thought (or presumed) that Debbie had thrown the gun at him "or something." He related that he was walking into the kitchen when he heard the gun go off, and had his back turned the whole time. When confronted with the facts that it was impossible for Debbie to have been shot by a falling gun because of the safety device on the gun and because of the forensics regarding her wound, the defendant then asserted that Debbie had the gun in her hand and was threatening to shoot him. He further acknowledged:
 outweighing her by 100 pounds;
 that the two of them fell on the door even though investigators determined that the door was not damaged;
 that she was not on the steps, and was instead standing in front of his truck when he heard the gun hit the ground and go off;
 that minutes later Debbie was behind the truck when the gun went off;
 that he picked Debbie up and ran to his Dad's house with her;
 that there was no struggle for the gun; and
 that he did not shoot his wife.
Finally, when the defendant was apprehended in Woodville, Texas, after being released on bond, the defendant volunteered to Det. Cowgill that Debbie died in a struggle over the gun. He related that *634 Debbie had pulled the gun on him and the gun went off while he took the gun away from her.
The defendant was charged by bill of indictment with the second degree murder of his wife, a violation of La. R.S. 14:30.1. He filed a motion to suppress statements, which was denied by the trial court after a hearing. The defendant appeared in court with counsel, and waived his right to a jury trial.
During the defendant's trial, the state presented evidence regarding the facts set forth hereinabove. Forensic evidence was also presented showing that the gun was equipped with a transfer bar designed to prevent accidental firing  that the gun would not fire unless the hammer was cocked manually and the trigger pulled to the rear. Evidence also showed that the shot was fired from a distance of over four feet.
One of Debbie's children testified that the defendant had physically abused Debbie only two weeks prior to the shooting, and that the door was leaning against a tree when she left for school on the morning of the shooting.
The defendant testified at trial that he shot Debbie after she pointed the gun at him with the hammer cocked. After threatening to kill him, she "started to kill herself" by putting the gun to her chin, and he tried to talk her out of it. She sat down on the bench and put the gun down on the bench. The hammer of the gun was still cocked. The defendant related that he took the gun from Debbie and then walked to the steps and sat down. The defendant was talking to her, and she was "turned to him" at the time, but was not saying anything to him. He related that the gun accidentally discharged when he tried to lower the hammer to its resting position by pulling the trigger. The defendant said he did not even notice she was shot until he walked up to her and put his hand on her shoulder because she was not answering him. The defendant asserted that he was knowledgeable about guns and was careful about gun safety, though he denied knowing that the gun had a safety bar.
In addition to the defendant's trial testimony, the defense presented other witnesses, including:
 Jack Gullette, a mechanic, who testified that he was an acquaintance of the defendant and Debbie. He talked with Debbie a week or two before her death and she said she "thought about killing herself and Owen, too."
 Steven Thompson, who was a friend of the couple, related that he saw Debbie on the Thursday before her death. She was upset and told Thompson that she was mad at the defendant and if she caught him with "that bitch" she was going to kill him and kill herself.
 Neal Alfred, a friend and the boyfriend of the defendant's sister, testified that he heard Debbie tell the defendant's sister on the night before she died that she was going to "kill your brother and kill myself" in the morning.
After a bench trial, the trial court found the defendant guilty of the responsive and lesser-included crime of manslaughter. The trial court's verdict was based on a finding that, under the totality of the evidence, the state proved the crime of manslaughter beyond a reasonable doubt. The trial court specifically found that the explanation that the shooting was accidental was not reasonable. The defendant was adjudicated a fourth felony habitual offender and sentenced to the minimum sentence of 40 years' imprisonment at hard labor, without benefits of probation, parole or suspension of sentence.

*635 DISCUSSION

Sufficiency of the Evidence
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
The Jackson standard applies to cases involving both direct and circumstantial evidence. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La. App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
When circumstantial evidence forms the basis for the conviction, such evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438. The court does not determine whether another possible hypothesis suggested by the defendant could afford an exculpatory explanation of the events; rather, when evaluating the evidence in the light most favorable to the prosecution, the court determines whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under Jackson v. Virginia. State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994); State v. Owens, supra.
The trial court found that the state had not proven the specific intent required to sustain a conviction of the charged offense of second degree murder.
The trial court concluded that the state did not have to eliminate the possibility that the shooting was accidental to find the defendant guilty of the lesser included offense of manslaughter.
The provisions regarding the crime of Manslaughter are set forth in La. R.S. 14:31:
A. Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or
(2) A homicide committed, without any intent to cause death or great bodily harm.
(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person; or
(b) When the offender is resisting lawful arrest by means, or in a manner, not inherently dangerous, and the circumstances are such that the killing would not be murder under Article 30 or 30.1.
B. Whoever commits manslaughter shall be imprisoned at hard labor for not more than forty years. However, if the victim was killed as a result of receiving a battery and was under the age of ten years, the offender shall be imprisoned at hard labor, without benefit of probation or suspension of sentence, for not less than ten years nor more than forty years.
Thus, there are four ways to prove manslaughter, only the first of which requires as an element the proof of specific intent to kill or inflict great bodily harm.
*636 Circumstantial evidence forms the basis for the conviction in this case. Hence, the evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438.
Robertson admitted at trial to shooting the victim, but asserted that the shooting was accidental (during his attempt to disarm his suicidal wife, who promised to kill him in the past if she caught him cheating on her). He therefore argues that the state had the obligation to exclude the possibility of accident before the manslaughter charge could be properly considered by the trial court. He alleges that the state was unable to exclude the reasonable possibility that the victim's death resulted from an accidental shooting, which should have resulted in an acquittal.
We disagree. The learned trial court found unreasonable any of the defendant's many explanations as to the actual nature of the shooting. This finding is clearly supported by the defendant's trial testimony wherein he admitted pulling the trigger on the gun while pointing it in his wife's direction. The defendant's position is also undercut by his crude attempt to stage the crime scene to look like an accident, as well as by his various inconsistent statements regarding how the shooting occurred. The evidence, viewed in the light most favorable to the prosecution, clearly supports a finding of an intentional homicide beyond a reasonable doubt.
Finally, we note that the evidence also supports a finding of two additional types of manslaughter:
 An unintentional killing directly caused by the defendant, during the course of the commission of a nonenumerated felony.[3]
 An unintentional killing directly caused by the defendant during the commission of an intentional misdemeanor directly affecting the person of the victim.[4]

Motion to Suppress
The defendant sought to suppress statements made to law enforcement officers while in custody after his arrest, providing these reasons for the suppression:
 The statements were involuntary because of misrepresentations and misstatements to him by interrogating officers.
 He was under the influence of drugs when he made the statements and therefore was not mentally capable of waiving any rights.
 While being questioned, he asked for assistance of counsel, but his request was ignored and the questioning continued.
 His second statement was made after defense counsel was appointed to represent him, but the officers failed to consult with his defense counsel before questioning him.
Detective Stacy Cowgill of the Caddo Parish Sheriff's Office testified that:
 on January 14, 2002, he was called to investigate the shooting;
 he advised the defendant of his rights as per Miranda, which Robertson said he understood and which the defendant waived;
 he then took a brief statement (unrecorded) from the defendant;

*637  the defendant did not appear to be under the influence of any alcohol, drugs or narcotics at the time, and appeared to understand Det. Cowgill's questions;
 Deputy Janet Sowell was also present during this statement at the scene;
 a second statement was taken at the Sheriff's Office from the defendant later that day, as witnessed by Caddo Sheriff's Detective Kay Ward and Deputy Jay Long; and
 the defendant said that he understood and waived those rights, signing a waiver of rights form.
Detective Kay Ward stated that:
 the defendant did not appear to be under the influence of alcohol or drugs, as his speech was not slurred, his pupils were not dilated, and he was coherent and responsive;
 no promises, threats or inducements of any kind were made to obtain the statement;
 the defendant then gave a recorded statement, which was later transcribed;[5]
 the defendant requested a lawyer at the "end portion" of the statement, at which time Deputy Long left the room, and whereupon Det. Ward asked the defendant if he said that he wanted a lawyer to talk to;
 the defendant "went on talking" and never "came back and said that he wanted a lawyer;" and
 the defendant was asked about fresh needle marks for recent drug use and he indicated that he had "done some meth" the evening before at his friend's house in Texas, and had taken some Valium at about 2:00 a.m. the day before he was arrested.
The entirety of this second statement consisted of the defendant attempting to give reasons why his wife was shot without him being at fault. The third statement was taken by Det. Cowgill from the defendant on January 16, 2002, at the Caddo Correctional Center. Det. Cowgill testified that:
 he and Deputy Hostnick met with the defendant as requested by him;
 prior to taking the statement, he advised the defendant of his Miranda rights and the defendant signed the waiver of rights card;
 Robertson did not appear to be under the influence of alcohol, narcotics or drugs, and his speech wasn't slurred;
 no promises, threats or inducements of any kind were made to obtain the statement;
 at the end of this statement, the defendant once requested an attorney;
 the statement was immediately terminated; and
 at the time of this statement, the officer was not aware that the defendant had made a court appearance and had defense counsel appointed.
After hearing the state's evidence and arguments from the state and defense, the trial court denied the motion to suppress as to all three statements, finding them freely and voluntarily given, and not made under any type of influence or duress.
The defendant presented no evidence at the motion to suppress. Consequently, there was no showing whatsoever that the effects of the drugs taken by the defendant on the night before the shooting had any intoxicating effect at the time of any of his *638 exculpatory statements, the last of which was given two days after the shooting. Testimony further indicated that, after the defendant requested an attorney, he initiated further conversation both with Det. Ward, and two days later, with Det. Cowgill.
In determining whether a ruling on a motion to suppress is correct, an appellate court is not limited to evidence adduced at the hearing on the motion but also may consider pertinent evidence given at trial. State v. Daniels, 614 So.2d 97 (La.App. 2d Cir.1993), writ denied, 619 So.2d 573 (La.1993).
At a suppression hearing, the state bears the burden of proving beyond a reasonable doubt the free and voluntary nature of the confession. State v. Hills, 354 So.2d 186 (La.1977); State v. Roddy, 33,-112 (La.App. 2d Cir.4/7/00), 756 So.2d 1272, writ denied, XXXX-XXXX (La.5/11/01), 791 So.2d 1288.
Before a confession can be introduced into evidence, the state must affirmatively prove that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La. R.S. 15:451; La. C. Cr. P. art. 703(D); State v. Bowers, 39,970 (La.App. 2d Cir.8/19/05), 909 So.2d 1038; State v. Roddy, supra. The state must also establish that an accused who makes a statement during custodial interrogation was first advised of his Miranda rights. State v. Bowers, supra; State v. Roddy, supra.
In State v. Jackson, 381 So.2d 485 (La.1980), and State v. Morvant, 384 So.2d 765 (La.1980), the supreme court stated the principles under which the admissibility of a confession must be judged. As a matter of federal constitutional law, any confession obtained by any direct or implied promises, however slight, or by the exertion of any improper influence, must be considered involuntary and inadmissible. State v. Roddy, supra.
The admissibility of a confession is a question for the trial court. When determining admissibility, the trial court's conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession will not be overturned on appeal unless not supported by the evidence. State v. Bowers, supra. We place great weight upon the trial court's factual determinations because of its opportunity to observe witnesses and assess credibility. State v. Crews, 28,153 (La.App. 2d Cir.5/8/96), 674 So.2d 1082. Testimony of the interviewing police officer alone may be sufficient to prove that the statement was given freely and voluntarily. State v. Bowers, supra; State v. Henderson, 31,986 (La.App. 2d Cir.8/18/99), 740 So.2d 240.
Intoxication may render a confession involuntary if it negates a defendant's comprehension and renders him unconscious of the consequences of what he is saying; whether intoxication exists and to a degree sufficient to vitiate voluntariness are questions of fact. State v. Narcisse, 426 So.2d 118 (La.1983), cert. denied, 464 U.S. 865, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983); State v. Bowers, supra. However, the mere fact of drug or alcohol intoxication is insufficient standing alone to render a confession involuntary. See State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994), where the confession was voluntary although defendant had smoked three or four cocaine rocks the night before his 11:00 p.m. statement, as well as consumed several beers the day he confessed. State v. Bowers, supra.
*639 Regarding requests for counsel, the supreme court stated in State v. Hobley, 98-2460, p. 29 (La.12/15/99), 752 So.2d 771, 788, cert. denied, 531 U.S. 839, 121 S.Ct. 102, 148 L.Ed.2d 61 (2000):
[O]nce a suspect in custody expresses a desire, at any stage in the process, to deal with the police only through counsel, all questioning must cease, and the accused may not be subject to further interrogation until counsel has been made available to him, unless he initiates further communication, exchanges or conversation with the police and validly waives his earlier request for counsel. Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981); Miranda, 384 U.S. at 444-45, 86 S.Ct. at 1612. Miranda and Edwards are prophylactic rules designed to protect an accused against the inherently compelling pressures of custodial interrogation, whether by police badgering, overreaching or subtle but repeated efforts to wear down an accused's resistance and make him change his mind. Oregon v. Bradshaw, 462 U.S. 1039, 1044, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983). Minnick v. Mississippi, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), reaffirmed Edwards, stating that "when counsel is requested, interrogation must cease; and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney." Id. at 153, 111 S.Ct. at 491.
Louisiana adheres to these same principles. When an accused invokes his right to counsel, the admissibility of a subsequent confession or incriminating statement is determined by a two-step inquiry: 1) did the accused initiate further conversation or communication; and 2) was the purported waiver of counsel knowing and intelligent under the totality of the circumstances. State v. Abadie, 612 So.2d 1, 5 (La.1993).
A careful review of the record supports the trial court's denial of the defendant's motion to suppress his statements. The state met its burden of proving that the statements were freely and voluntarily given by the evidence it presented, which included testimony given by the interviewing officers and the introduction of tape-recorded statements and the signed Miranda waiver of rights forms. It is clear that the defendant was advised of his Miranda rights and waived those rights before giving the statements, and that the statements were not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. Likewise, the record supports the trial court's apparent determination that the defendant was not intoxicated when he gave any of his statements. Finally, the record supports the trial court's apparent conclusion that, after the defendant invoked his right to counsel during the two recorded statements, either the interview was terminated or the defendant initiated further conversation or communication. The record shows that the waiver of counsel was knowing and intelligent under the totality of the circumstances. We decline to overturn the trial court's conclusions on the credibility and weight of testimony relating to the voluntary nature of the confessions. We place great weight upon the trial court's factual determinations in deference to its opportunity to observe witnesses and assess credibility. In sum, we find no abuse of discretion by the trial court in its denial of the motion to suppress.

DECREE
The defendant's conviction and sentence are AFFIRMED.
NOTES
[1] Technically, La. R.S. 14:31 and La. R.S. 15:529.1(A)(1)(b)(I) and G do not provide for a prohibition against parole. We are aware that a trial court apparently lacks authority to prohibit parole eligibility pursuant to that statute. See State v. Larrivere, 98-1399 (La. App. 3d Cir.5/5/99), 733 So.2d 703. We merely note this glitch because, as a fourth felony offender, the defendant is not eligible for parole on that basis, as per La. R.S. 15:574.4(A)(1), making this a distinction without a discernable difference. Compare State v. Sweat, 40,625 (La.App. 2d Cir.4/12/06), 926 So.2d 779.
[2] Brand name for a concrete mix.
[3] At the time of the shooting, defendant was a felon in possession of a firearm. He also committed the felony offense of illegal use of a weapon.
[4] Aggravated Assault or Simple Battery or Simple Assault are possibilities.
[5] The transcript of the statement was introduced into evidence at the hearing on the Motion to Suppress.